PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 14-4183

HANOVER 3201 REALTY, LLC,

Appellant

v.

VILLAGE SUPERMARKETS, INC.; ABC
CORPORATIONS 1-10 (names being fictitious and unknown
but described as those corporations associated with Village
that assisted with and promoted the use of sham litigations
and anti-competitive acts); JOHN DOES 1-10 (names being
fictitious and unknown but described as those individuals
associated with Village that assisted with and promoted the
use of sham litigations and anti-competitive acts);
HANOVER AND HORSEHILL DEVELOPMENT LLC

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 2-14-cv-01327)
District Judge: Honorable Stanley R. Chesler

Argued: June 18, 2015

Before: AMBRO, FUENTES, and GREENBERG, *Circuit Judges*

(Opinion Filed: November 12, 2015)

John M. Agnello, Esq.
James E. Cecchi, Esq.
Lindsey H. Taylor, Esq.  **[ARGUED]**
Carella Byrne Cecchi Olstein Brody & Agnello
5 Becker Farm Road
Roseland, NJ 07068

*Attorneys for Appellant, Hanover 3201 Realty, LLC*

Anthony Argiropoulos, Esq.  **[ARGUED]**
Thomas Kane, Esq.
Epstein Becker & Green
One Gateway Center
Newark, NJ 07102

David W. Fassett, Esq.
Arseneault & Fassett
560 Main Street
Chatham, NJ 07928

*Attorneys for Appellees, Village Supermarkets, Inc. and
Hanover and Horsehill Development LLC*

---

OPINION OF THE COURT

---

FUENTES, *Circuit Judge*, with whom AMBRO, *Circuit Judge*, joins as to Parts II.A.2, II.B, and II.C, and GREENBERG, *Circuit Judge*, joins as to Part II.A.

Hanover 3201 Realty, LLC ("Hanover Realty") signed a contract with Wegmans to develop a supermarket on its property in Hanover, New Jersey. The agreement required Hanover Realty to secure all necessary governmental permits and approvals prior to breaking ground. Village Supermarkets, Inc. ("ShopRite") owns the local ShopRite. Once ShopRite and its subsidiary Hanover and Horsehill Development LLC ("H&H Development") (collectively, "Defendants") caught wind that Wegmans might be entering the market, they filed numerous administrative and court challenges to Hanover Realty's permit applications. Believing these filings were baseless and intended only to frustrate the entry of a competitor, Hanover Realty sued Defendants for antitrust violations. Hanover Realty alleged that Defendants attempted to restrain the market for full-service supermarkets as well as the market for full-service supermarket rental space. The District Court dismissed the suit, holding that Hanover Realty did not have antitrust standing because it was the wrong plaintiff—it was not a competitor, consumer, or participant in the restrained markets and thus did not sustain the type of injury the antitrust laws were intended to prevent. [1]

We conclude that, with respect to the claim for attempted monopolization of the market for full-service supermarkets, the District Court took too narrow a view of antitrust injury. Hanover Realty can establish that its injury

---

[1] For the reasons set forth in Part III of Judge Ambro's partial concurrence, I agree with Judge Ambro's decision to use an "issue voting" approach to determine the outcome of the judgment in this case.

was "inextricably intertwined" with Defendants' anticompetitive conduct. However, as to the claim for attempted monopolization of the market for rental space, the District Court correctly found no standing because Hanover Realty does not compete with Defendants in that market. We also hold that Hanover Realty has sufficiently alleged that the petitioning activity here was undertaken without regard to the merits of the claims and for the purpose of using the governmental process to restrain trade. As such, Hanover Realty can demonstrate that Defendants are not protected by *Noerr-Pennington* immunity because their conduct falls within the exception for sham litigation. Accordingly, we will affirm in part, vacate in part, and remand to the District Court for further proceedings.

## I.     BACKGROUND

Plaintiff Hanover Realty is a real estate developer and the owner of a plot of land in Hanover, New Jersey.[2]  In July 2012, Hanover Realty entered into a lease and site-development agreement with Wegmans for the purpose of constructing a "full-service supermarket."  App. 66.  These types of supermarkets, in contrast to their local grocery store counterparts, provide customers with a "one-stop shopping" experience.  App. 67.  Full-service supermarkets supply not only traditional groceries, but also additional amenities, including prepared foods to go, on-site dining options, wine and liquor, specialty products, and other services such as pharmacies, banks, and fitness centers.  The site-development agreement placed the burden on Hanover Realty to obtain all necessary governmental permits prior to beginning construction.  If Hanover Realty was unable to secure the required permits within two years of the agreement, Wegmans could walk away from the deal.

Defendant ShopRite is the proprietor of 26 ShopRite supermarkets in New Jersey, including a ShopRite in Hanover that is about two miles away from the site of the proposed Wegmans.  The ShopRite opened in November 2013 and replaced the previous one in Morris Plains, which has since closed.  Defendant H&H Development, a wholly-owned subsidiary of ShopRite, owns the property on which the Hanover ShopRite sits, and leases the land or building to

---

[2] Unless otherwise indicated, the facts are taken from the amended complaint, documents relied upon in that complaint, and matters of public record.  *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

ShopRite. ShopRite and H&H Development have the same decision makers. Hanover Realty alleges that the ShopRite in Hanover is the only full-service supermarket operating in the greater Morristown area.

Once news broke that Wegmans was coming to town, Defendants launched a petitioning campaign designed to block Hanover Realty from obtaining the permits and approvals it needed to proceed with the project. We describe these filings here.

*First*, Hanover Realty applied for a Flood Hazard Area Permit ("Flood Permit") from the New Jersey Department of Environmental Protection ("Environmental Department"). After Hanover Realty received the permit, ShopRite (on behalf of itself and H&H Development) submitted an appeal to the Environmental Department requesting an adjudicatory hearing and seeking an order that would vacate the permit. Defendants asserted that they had standing to bring the appeal because the then-existing ShopRite in Morris Plains would be "detrimentally impacted" by the competition from the Wegmans. App. 74. Over the next five months, Defendants submitted additional documents to the Environmental Department, including an objection that Hanover Realty failed to comply with relevant notice requirements and an amended request for an adjudicatory hearing.

About a month after Hanover Realty filed its amended complaint in this action, the Environmental Department issued an order denying Defendants' request for a hearing. It first found that ShopRite had no standing, explaining that "[c]ourts have consistently held that proximity or any type of generalized property right shared with other property owners such as recreational interests, traffic, views, quality of life,

6

and property values are insufficient to demonstrate a particularized property right required to establish third party standing for a hearing." App. 157. ShopRite's "generalized property rights" and its claim of "greater competition" from the proposed Wegmans were not enough to show that it was an aggrieved party. The Environmental Department also evaluated the substance of Defendants' arguments and found them without merit.

*Second*, Hanover Realty submitted a multi-permit application to the Environmental Department seeking various wetlands approvals ("Wetlands Permit") for the Wegmans project. An ecological consulting firm sent a letter to the Environmental Department on behalf of Defendants raising various challenges to this permit. One objection was that Hanover Realty's notice to neighboring landowners was "technically deficient." App. 77. In response to this objection, and as "required" by the Environmental Department, Hanover Realty corrected this "administrative error" the next week and submitted a revised application. App. 169. The ecological consultant also voiced its concern that the site of the proposed Wegmans was a potentially suitable habitat for certain endangered species, including the Indiana bat.[3] A few days later, Defendants submitted another letter to the Environmental Department, this time requesting a meeting to discuss the Wetlands Permit and "strongly

---

[3] Indiana bats may be found over a broad swath of the United States, including New Jersey. But true to name, half of this bat population does, in fact, hibernate in Indiana. *See* Indiana Bat Fact Sheet, U.S. Fish & Wildlife Service, http://www.fws.gov/midwest/endangered/mammals/inba/inba fctsht.html (last visited Aug. 13, 2015).

7

urg[ing]" it to "diligently and prudently" review the permit and not act with "haste" in granting approval. App. 78. In the following months, Defendants' ecological consultant complained to the United States Fish and Wildlife Service about the Wetlands Permit. In one email to the Wildlife Service, the consulting firm praised itself for "manag[ing] to delay the issuance of the [Wetlands] approvals based on a technicality" and said that its substantive objections "may delay things a bit longer." App. 80. Hanover Realty responded to Defendants' multifaceted challenge with its own submissions, explaining why, in its view, each objection was unsubstantiated. Moreover, Hanover Realty alleges that Defendants knew the wetlands at issue are not federally regulated waters, but nonetheless contacted the Wildlife Service to add friction to the review process.

The Environmental Department issued Hanover Realty its requested Wetlands Permit, subject to various conditions. One such condition required Hanover Realty to conduct a survey for the presence of Indiana bats prior to construction.[4] After the Environmental Department issued the permit, Defendants submitted a request for an adjudicatory hearing to challenge the approval.[5]

*Third*, the tract of land owned by Hanover Realty has been the subject of several contracts and sales over the years,

[4] In its appellate brief, Hanover Realty informs us that it conducted the Indiana bat survey and no bats were found.

[5] In a supplemental letter filed with the Court, Hanover Realty says that, in June 2015, the Environmental Department denied Defendants' request for a hearing.

including a four-phased developer's agreement with the New Jersey Department of Transportation that dates back to 1978. Under that agreement, the owner of the land must make certain road improvements as it reaches various phases of development. Hanover Realty believed the Wegmans project would trigger Phase III of the agreement. Consistent with that understanding, Hanover Realty submitted an application for a Major Street Intersection Permit ("Street Permit") to the Department of Transportation in which it proposed improvements to a nearby intersection in connection with the Wegmans project. Defendants submitted a letter objecting to the application, and then proceeded to file a number of open public records requests seeking additional information upon which they could contest the application. Defendants then sent another letter to the Department of Transportation informing it that the Wegmans project would trigger Phase IV of the developer's agreement. As a result, Defendants said, Hanover Realty was required to build an overpass over a nearby highway before it could proceed any further. Hanover Realty and its traffic engineering consultant submitted letters of their own, explaining that the Phase IV requirements (including the overpass) were not implicated by the Wegmans project. Hanover Realty alleges that Defendants knew the Phase IV obligations were not triggered because their counsel had negotiated the developer's agreement.

The Department of Transportation issued a letter responding to the parties' various submissions relating to the Street Permit application. The letter began by acknowledging that the Department of Transportation is "required to consider any relevant data, analysis, and arguments submitted by third parties." App. 165. It then agreed with Defendants that the proposed development would generate traffic at certain hours that would exceed the level of traffic contemplated by Phases

9

I, II, and III of the developer's agreement. Moreover, although it did not specifically mention the overpass or whether Phase IV obligations would be implicated, the Department of Transportation said the Wegmans project "would trigger the need for additional highway improvements as stipulated in the [developer's] agreement." App. 167. It noted, however, that the "improvements may no longer be appropriate or feasible" and therefore recommended that Hanover Realty negotiate a modification to the agreement with the Department of Transportation. App. 167.[6]

*Fourth*, in mid-2012, Hanover Realty applied to the Hanover Township Committee to rezone the property of the proposed Wegmans so that it could be used for retail space. The next summer, Hanover Realty received approval of its final site plan and request for a bulk variance. Defendants did not lodge any objections during that year-long process. Instead, in August 2013, ShopRite (on behalf of itself and H&H Development) filed an action in lieu of prerogative writs in New Jersey state court seeking to nullify the approval. Over the next several months, Defendants filed three amended complaints, which Hanover Realty alleges were filed for the purpose of delay.

In June 2014, after Hanover Realty had filed its amended complaint in the present litigation, the Superior Court of New Jersey issued an order dismissing the prerogative writs action. The court found that ShopRite was

---

[6] Hanover Realty informs us in a letter that, after renegotiating the developer's agreement and otherwise revising its proposal, the Department of Transportation issued the Street Permit in April 2015.

not an "interested party" because it failed to allege facts suggesting its "right to use, acquire, or enjoy either of its nearby properties" would be affected by the approval of Hanover Realty's site plan. App. 136. In addition, the court rejected ShopRite's argument that it had standing based on its status as a local taxpayer. After ruling against ShopRite on the standing issue, the court also addressed and disposed of ShopRite's arguments on the merits.

Frustrated by Defendants' many legal challenges, Hanover Realty sued Defendants in federal court. In its amended complaint, Hanover Realty alleges that Defendants' administrative objections and state-court suit were mere anticompetitive shams designed to keep Wegmans out of the market. Specifically, it asserts claims under Section 2 of the Sherman Act for attempted monopolization of and conspiracy to monopolize the greater Morristown full-service supermarket market (Count One) and the greater Morristown full-service supermarket shopping center market, which it describes as the market for supermarket rental space (Count Two). The amended complaint also contains five-state law claims.

Defendants moved to dismiss the complaint for four independent reasons. The District Court found the threshold issue of antitrust standing dispositive and dismissed the complaint on that ground. It observed that, as a general matter, plaintiffs in antitrust suits must be either consumers or competitors of the defendant in the restrained market—here, the markets for supermarkets and supermarket rental space. Hanover Realty was neither a consumer nor competitor of Defendants in either market. The District Court acknowledged the limited exception to the consumer/competitor requirement for persons whose injuries

11

are "inextricably intertwined" with the harm caused by defendants. But it found Hanover Realty did not fit within that narrow exception either. As a result, Hanover Realty had suffered no antitrust injury and thus had no antitrust standing to pursue its Sherman Act claims.[7] Without a federal claim in play, the District Court declined to exercise supplemental jurisdiction over the state-law claims. Hanover Realty appealed.[8]

## II.    DISCUSSION

Defendants raise four arguments in support of the District Court's order: (1) Hanover Realty does not have antitrust standing; (2) Defendants' petitioning activity was protected by the *Noerr-Pennington* doctrine; (3) Hanover Realty has not sufficiently alleged that there is a dangerous probability of Defendants achieving monopoly power; and (4) Hanover Realty has failed to plead a specific intent to monopolize.

---

[7] The District Court also dismissed the parts of Counts One and Two that assert a conspiracy to violate the Sherman Act because Hanover Realty failed to allege the particulars of this conspiracy. As Hanover Realty does not challenge this finding on appeal, we affirm the dismissal of Counts One and Two to the extent they contain conspiracy claims.

[8] The District Court had jurisdiction under 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1367, and we have jurisdiction to review the District Court's final order under 28 U.S.C. § 1291. We review de novo a district court's grant of a motion to dismiss and construe all facts in the light most favorable to the nonmoving party. *See Rea v. Federated Investors*, 627 F.3d 937, 940 (3d Cir. 2010).

## A. Antitrust Standing

We begin with antitrust standing. Section 2 of the Sherman Act prohibits any attempt to monopolize. 15 U.S.C. § 2. Section 4 of the Clayton Act, in turn, defines the class of persons who may bring a private antitrust suit as "any person" who is injured "by reason of anything" prohibited by the antitrust laws. *Id.* § 15(a). This extraordinarily broad language reflects the Clayton Act's remedial purpose and Congress's intent to "create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982). Emphasizing § 4's expansive reach, the Supreme Court has explained that the "statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. . . . The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Id.* (quoting *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948)).

Although a literal reading of § 4's grant of authority to sue arguably is limited only by the minimal requirements of constitutional standing, the Supreme Court has interpreted this provision more restrictively than that. *See Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 n.14 (1972) ("Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."). Thus, even when there is a clear violation of the antitrust laws, § 4 allows only a "proper plaintiff" to bring a private suit to remedy that violation. *See*

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 544 (1983). In other words, only certain plaintiffs have "antitrust standing." *Id.* at 535 n.31. In describing how to undertake the antitrust standing inquiry, the Supreme Court has warned that, because of the "infinite variety of claims" that may arise under § 4, a "black-letter rule" cannot dictate the result in every case. *Id.* at 536. Instead, the Court has articulated several guideposts. *See id.* at 536-57. We have distilled these antitrust standing factors as follows:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3d Cir. 1993) (citing *Associated Gen.*, 459 U.S. at 545). Although we weigh these factors together on a case-by-case basis, the second factor, antitrust injury, "is a necessary but insufficient condition of antitrust standing." *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997).

14

Antitrust injury has proven difficult to define and apply. The Supreme Court has described it as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). In evaluating the nature of a plaintiff's injury, the Supreme Court instructs us to keep in mind that "the Sherman Act was enacted to assure customers the benefits of price competition" and "protect[] the economic freedom of participants in the relevant market." *Associated Gen.*, 459 U.S. at 538. Based on these principles, we have said that, "[a]s a general matter, the class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and competitors in the restrained market . . . and to those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010) (citing cases). As Hanover Realty offers distinct theories of injury for each of its attempted monopolization claims—one for the market for full-service supermarkets (Count One) and another for the market for full-service supermarket rental space (Count Two)—we discuss these claims separately.

### 1. Full-Service Supermarkets

Hanover Realty admits it is neither a competitor nor a consumer in the market for full-service supermarkets; it is a land owner and lessor of property, not a food retailer. It instead argues that its injuries were "inextricably intertwined" with Defendants' attempt to monopolize that market.

The Supreme Court first recognized this form of antitrust injury in *McCready*. McCready was an employee covered by a group health plan purchased from the defendant

15

Blue Shield. *McCready*, 457 U.S. at 468. Under the plan, Blue Shield agreed to reimburse subscribers such as McCready for services provided by psychiatrists, but not by psychologists. McCready was treated by a psychologist and sought reimbursement for her bills, but Blue Shield denied payment. She then filed suit against Blue Shield and a psychiatric society alleging that the two had engaged in an unlawful antitrust conspiracy to exclude psychologists from receiving payment under the Blue Shield plan. *Id.* at 469. The defendants argued that McCready had not suffered antitrust injury because the alleged conspiracy was directed at psychologists and not at subscribers of group health plans. *Id.* at 478. The Supreme Court rejected the defendants' view of antitrust standing, explaining that the § 4 "remedy cannot reasonably be restricted to those competitors whom the conspirators hoped to eliminate from the market." *Id.* at 479. Although McCready was not a competitor of the defendants, "the injury she suffered was *inextricably intertwined* with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." *Id.* at 483-84 (emphasis added). And while McCready was a consumer in the market for psychotherapy services, the Supreme Court's explanation of why she suffered antitrust injury emphasized not her status as a market participant, but rather that she was directly targeted for harm by parties ultimately wishing to inflict a derivative harm on a competitor. As the Court noted, "[d]enying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends." *Id.* at 479. The harm to subscribers like McCready was not only clearly foreseeable, "it was a necessary step in effecting the ends of the alleged illegal conspiracy." *Id.*

16

Underscoring that its reasoning was not limited to consumers, the Court offered the following hypothetical to crystalize the nature of McCready's injury: "If a group of psychiatrists conspired to boycott a bank until the bank ceased making loans to psychologists, the bank would no doubt be able to recover the injuries suffered as a consequence of the psychiatrists' actions." *Id.* at 484 n.21. McCready and the bank "are in many respects similarly situated," the Court explained, even though the bank is not a customer or consumer in the psychotherapy market. *See id.* Both were used as conduits to harm the defendants' actual competitors. Because imposing harm on McCready was an indispensable aspect of the scheme, the Court concluded that the injury to McCready "reflect[ed] Congress' core concerns" in prohibiting the defendants' conduct. *Id.* at 481.

In contrast to *McCready*, where the alleged harm to the plaintiff was the primary means of the defendants' anticompetitive conduct, harm that is secondary to the anticompetitive conduct cannot support antitrust injury. For example, we have said that, "[a]lthough a supplier may lose business when competition is restrained in the downstream market in which it sells goods and services, such losses are merely byproducts of the anticompetitive effects of the restraint," and do not qualify as antitrust injury. *W. Penn Allegheny*, 627 F.3d at 102. To illustrate, in *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 225-26 (3d Cir. 2013), a foreign drug manufacturer, Ethypharm, used a domestic distributor to sell one of its drugs in the United States market. After Abbott, the distributor of another drug, sued the domestic distributor for patent infringement, Ethypharm sued Abbott for antitrust violations. We rejected the notion that Ethypharm's injury was inextricably

intertwined with the alleged scheme. *See id.* at 237. To effectuate its conspiracy, Abbott needed only to place restrictions on Ethypharm's domestic distributor and thus any harm suffered by Ethypharm was incidental, rather than essential, to the restraint on trade. *See id.* at 233. Similarly, in *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 319-20 (3d Cir. 2007), the plaintiff's asserted basis for antitrust standing was that the defendant's restraint in one market injured it by suppressing the demand of participants in the restrained market for the plaintiff's supply of goods in another market. As in *Ethypharm*, we said the alleged injury was not inextricably intertwined with the anticompetitive scheme because it crossed markets and was attenuated from the anticompetitive conduct. *See id.* at 320-21. Together, *Ethypharm* and *Broadcom* support the proposition that suppliers and other non-market participants generally do not have antitrust standing unless their injuries were the very means by which the defendants carried out their illegal ends. As we said in *West Penn Allegheny*, "[a]s a general matter, the class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and competitors in the restrained market . . . *and* to those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends." 627 F.3d at 102 (emphasis added).

Because Hanover Realty alleges that its harm was the essential component of Defendants' anticompetitive scheme as opposed to an ancillary byproduct of it, we conclude that Hanover Realty has sufficiently pleaded antitrust injury under *McCready*. The ultimate objective of the defendants in *McCready* was to injure psychologists, not plan subscribers. To achieve that goal, they refused to reimburse subscribers for visits to psychologists, thereby encouraging subscribers to visit psychiatrists. Without injuring those subscribers, there

18

was no conspiracy. Likewise, *McCready*'s hypothetical bank, which was neither a consumer nor competitor in the psychotherapy market, sustained actionable injury because it was directly harmed as the means of injuring psychologists.

Similar reasoning applies here. The end goal of Defendants' alleged anticompetitive conduct was to injure Wegmans, a prospective competitor. To keep Wegmans out of the market, Defendants sought to impose costs not on their competitor, but on Hanover Realty, the party tasked with obtaining the necessary permits before construction could begin. Absent this relationship between Hanover Realty and Wegmans, Defendants' conduct "would have been without purpose or effect." *Steamfitters Local Union No. 420 Welfare Fund v. Philips Morris, Inc.*, 171 F.3d 912, 923 (3d Cir. 1999). And Defendants would succeed in their scheme either by inflicting such high costs on Hanover Realty that it was forced to abandon the project or by delaying the project long enough so that Wegmans would back out of the agreement. In both scenarios, injuring Hanover Realty was the very means by which Defendants could get to Wegmans; Hanover Realty's injury was necessary to Defendants' plan.

Had Wegmans purchased the property from Hanover Realty and itself applied for the permits, the costs imposed by Defendants' challenges would have qualified as antitrust injuries. It should make no difference that the parties' lease shifted these costs to Hanover Realty. *See McCready*, 457 U.S. at 479 (observing that antitrust injury "cannot reasonably be restricted to those competitors whom [defendants] hoped to eliminate from the market"). Regardless of who bore these costs, Defendants' objective remained the same: to keep Wegmans out of the relevant market.

19

Defendants seize on language from our precedent saying "we have not extended the 'inextricably intertwined exception beyond cases in which both plaintiffs and defendants are in the business of selling goods or services *in the same relevant market*,' though they may not directly compete against each other." *See Ethypharm*, 707 F.3d at 237 (quoting *Broadcom*, 501 F.3d at 320-21). According to Defendants, because Hanover Realty and ShopRite do not operate in the same market, "Hanover Realty cannot establish antitrust injury unless the Court were to break with *Ethypharm* and *Broadcom* and greatly expand the scope of the 'inextricably intertwined' exception—an expansion that would swallow the rule." Appellees' Br. at 19.

Defendants read too much into these statements.[9] As

---

[9] We pause to note that at least one of our cases discussing antitrust injury contains language that is potentially overstated. In *Barton & Pittinos*, without mentioning the "inextricably intertwined" doctrine, we found no antitrust injury because the plaintiff was "not a competitor or a consumer in the market in which trade was allegedly restrained." 118 F.3d at 184. We later cast doubt on that statement, clarifying that the conclusion in *Barton*, "if construed as an absolute (which arguably it need not be), may in some circumstances lead to results that conflict with Supreme Court and other precedent." *Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 76 (3d Cir. 2000), *overruled on other grounds*, *Animal Science Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462 (3d Cir. 2011). We, of course, agree with *Carpet Group* and our other cases that have allowed for the possibility of antitrust injury based on a showing of harm that is inextricably intertwined with the

20

an initial matter, just because we have not extended the exception beyond parties that sell goods or services in the same market by no means suggests we shouldn't (or can't ) do so. In fact, *McCready* suggests the opposite conclusion. McCready did not sell goods or services in the psychotherapy market—she was a subscriber to a health insurance plan. Nor was the hypothetical bank in *McCready* even a participant in the psychotherapy market. Nonetheless, both sustained harm that was inextricably intertwined with the defendants' misconduct. Because § 4 "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers" we must avoid placing artificial limits on who may bring suit under the antitrust laws. *McCready*, 457 U.S. at 472 (citations omitted). Moreover, our comments in *Ethypharm* and *Broadcom* must be read in context. As we discussed, the alleged injuries to the plaintiffs in those cases were byproducts of anticompetitive restraints in separate markets. In contrast, although Hanover Realty and ShopRite operate in separate markets, the very essence of Defendants' scheme was to impose expense and delay on Hanover Realty as a means of keeping Wegmans out of the relevant market.

Defendants' final line of defense against a finding of antitrust injury rests on cases from other jurisdictions. In an industry notorious for low profit margins, perhaps it is not surprising that this is just the latest in a series of cases in which a supermarket allegedly employed anticompetitive tactics to keep a competitor out of the market.[10] Defendants

---

defendant's wrongdoing, rather than harm just to competitors or consumers.

[10] *See, e.g.*, *Serfecz v. Jewel Food Stores*, 67 F.3d 591 (7th Cir. 1995); *Southaven Land Co. v. Malone & Hyde, Inc.*, 715

rely mostly on the Sixth Circuit's decision in *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079.

Southaven was an owner-lessor of commercial space and Malone operated a number of grocery stores in the neighborhood. *Southaven*, 715 F.2d at 1080. Malone assumed a lease to premises owned by Southaven, but the parties later agreed to cancel the agreement. However, upon learning that Southaven intended to find a grocery store to fill the vacancy, Malone refused to cancel the contract. Malone continued to pay rent on the vacant lot and did not otherwise breach any of its contractual obligations. *Id.* at 1087. Southaven nonetheless sued for antitrust violations, alleging that Malone intended to leave the space vacant so as to destroy competition for its other grocery stores. The Sixth Circuit rejected Southaven's argument that its injury was inextricably intertwined with the injury Malone sought to inflict on the grocery market. *Id.* at 1086-87. It explained that "Southaven [a real estate lessor] is not alleged to be a member of a class of 'consumers' of grocery products or a class otherwise manipulated or utilized by Malone as a fulcrum, conduit or market force to injure competitors or participants" in the relevant market. *Id.* at 1086. Rather, Southaven's injury was, at most, a "tangential by-product" of the alleged monopolistic conduct. *Id.* at 1086-87.

We do not find *Southaven* persuasive here because it addressed a different set of facts and a different kind of

F.2d 1079 (6th Cir. 1983); *Acme Mkts., Inc. v. Wharton Hardware & Supply Corp.*, 890 F. Supp. 1230 (D.N.J. 1995); *Rosenberg v. Cleary, Gottlieb, Steen & Hamilton*, 598 F. Supp. 642 (S.D.N.Y. 1984).

injury. Southaven's only economic harm was the vague allegation that Malone was "subvert[ing] [its] business and financial interests." *Id.* at 1087. This supposed subversion of business interests was not the means by which Malone was trying to achieve its illegal ends; it was an incidental effect in the real estate rental market rather than the grocery market. Indeed, by continuing to pay rent and honoring its contractual obligations, Malone arguably did not intend to harm Southaven at all. As in *Ethypharm* and *Broadcom*, the alleged downstream harm was too attenuated to support antitrust injury. In fact, *Southaven* supports the view that there *was* antitrust injury here, for Hanover Realty was used as the "fulcrum, conduit or market force" that was missing in *Southaven*. Forcing Hanover Realty to pay thousands of dollars in legal fees to defend itself against alleged anticompetitive filings and imposing significant delays on the project were the very means by which Defendants sought to keep a competitor out of the market.[11] For all these reasons, we conclude that Hanover Realty has sufficiently alleged antitrust injury in the market for full-service supermarkets because its injury was inextricably intertwined with Defendants' monopolistic conduct.

---

[11] Defendants also urge us to follow *Rosenberg*, a decades-old district court decision from outside this circuit. Although *Rosenberg* involved similar facts to those here—competitor supermarkets filing a series of lawsuits to enjoin the construction of a new supermarket—the court's legal analysis is not persuasive. *See* 598 F. Supp. at 643-44. The court mechanically applied *Southaven* without even mentioning the possibility of antitrust injury based on the "inextricably intertwined" exception. *Id.* at 645.

In his dissent in part, Judge Ambro says that, in his view, a "plaintiff has not suffered antitrust injury unless its own harm stems from the anticompetitive consequences of the defendant's conduct." Judge Ambro Op. at 3. According to Judge Ambro, the plaintiff's injury in *McCready* was actionable because she was a consumer in the psychotherapy market and Blue Shield "used a classic antitrust harm— increased prices—as a fulcrum to distort" that market. *Id.* at 4. Judge Ambro believes that McCready was "injured because of the anticompetitive effects" of Blue Shield's conduct, but that Hanover Realty did not sustain a similar type of injury. *Id.* In our view, Judge Ambro's analysis resembles that espoused by then-Justice Rehnquist in his dissent in *McCready*. Justice Rehnquist said that McCready could not recover under the antitrust laws because she "alleges no anticompetitive effect upon herself"—her harm did not arise from an increase in price, decrease in availability of services, or reduction in competition. *McCready*, 457 U.S. at 489 (Rehnquist, J., dissenting).

The majority agreed that McCready did not suffer one of these traditional forms of antitrust harm, but that did not foreclose relief. *See id.* at 482-83. She suffered antitrust injury because the harm imposed on her—denying reimbursement for visits to her psychologist—was the very means by which Blue Shield sought to harm psychologists. Similarly, Hanover Realty does not allege a classic antitrust harm, but it nonetheless sufficiently alleges antitrust injury because its harm was the very means by which Defendants sought to keep Wegmans out of the market. Indeed, Hanover Realty was the immediate target and bore the costs of Defendants' scheme.

Moving to the other four factors of the antitrust

standing analysis, we first find that Hanover Realty sufficiently alleges a causal connection between the antitrust violation and its harm. Defendants' alleged sham petitioning caused Hanover Realty to pay thousands of dollars in attorney's fees and costs in filing its responses.

The next two factors are interrelated and go to the directness of the injury and the existence of more direct victims of the antitrust violations. These both favor Hanover Realty as well. Under *McCready*, a plaintiff can suffer direct injury even if the defendant's anticompetitive conduct ultimately targets a third party; although the defendants there sought to harm competing psychologists and not the plaintiff health plan subscriber, the Supreme Court declared that the denial of reimbursement for those receiving treatment from psychologists injured the plaintiff "directly." 457 U.S. at 483. Likewise, Defendants' legal challenges directly injured Hanover Realty. If Defendants' attempt to prevent Wegmans from leasing the property fails, then Hanover Realty will have suffered the costs of responding to the legal challenges while Wegmans may have experienced no loss at all. In addition, to the extent Defendants succeed in obstructing the lease, Hanover Realty's loss of rent under the contract would result directly and not through "several somewhat vaguely defined links." *Associated Gen.*, 459 U.S. at 540. That Wegmans is another possible direct victim "does not diminish the directness of [Hanover Realty's] injury." *Lower Lake Erie*, 998 F.2d at 1168-69.

The final factor, the potential for duplicative recovery or complex apportionment of damages, also supports standing. Hanover Realty's recovery of the costs of responding to the legal challenges would not pose a risk "of overlapping damages as no other [party has] suffered this

distinct type of injury." *Id.* at 1164 n.11. Furthermore, any damages awarded for the delay or obstruction of the lease would not yield duplicative recovery as the lost rent to Hanover Realty would have to be subtracted as a cost from any subsequent claim by Wegmans for lost profits. *See id.* at 1169 n.22. Although this last scenario would require some apportionment of damages, the calculation would not be complex.

Accordingly, Hanover Realty has adequately alleged antitrust standing on its claim for attempted monopolization of the market for full-service supermarkets.

## 2. Full-Service Supermarket Shopping Centers

Hanover Realty does not rely on the "inextricably intertwined" doctrine for its attempted monopolization claim concerning the market for full-service supermarket shopping centers. Instead, Hanover Realty argues that it directly competes in this market for rental space with H&H Development, which owns the land on which the ShopRite resides.

Antitrust injury ordinarily is limited to consumers and competitors in the restrained market. *See Ethypharm*, 707 F.3d at 233. If doubts arise as to whether the parties are competitors, we look to see whether "there is a cross-elasticity of demand between the plaintiffs' offering and the defendants' offering." *Carpet Grp.*, 227 F.3d at 77. Such cross-elasticity exists where customers of the defendant would switch to the plaintiff if the defendant raised its prices. *Id.* at 77 n.13.

Hanover Realty argues that both it and H&H

Development compete in the marketplace for supermarket rental space because they "both operate an enterprise in it." Appellant's Br. at 44. We are not persuaded. According to Hanover Realty, H&H Development is a wholly-owned subsidiary of ShopRite; the two have the same decision makers; H&H Development owns no property other than the land on which the ShopRite sits; and H&H Development leases that property to its parent. Hanover Realty fails to explain how it competes with H&H Development as a supermarket landlord in any meaningful way. For example, it does not argue there is any cross-elasticity between Hanover Realty's and H&H Development's offerings. If a traditional supermarket landlord raised rent to an excessive level, then the supermarket presumably would move its business to another property, such as Hanover Realty's. But why would H&H Development raise ShopRite's rent given that they have the same decision makers? As H&H Development's sole purpose is to own the ShopRite property, Hanover Realty never alleges that H&H Development is competing for any tenants other than its parent—to the extent one can even call that "competing." Because Hanover Realty cannot establish antitrust injury in the market for full-service supermarket shopping centers, it has no standing to bring its attempted monopolization claim of this market. Therefore, we affirm the dismissal of Count Two of the amended complaint.

## B.    *Noerr-Pennington*

Having survived (in part) the threshold issue of antitrust standing, we proceed to Hanover Realty's next major

obstacle: *Noerr-Pennington* immunity.[12] The *Noerr-Pennington* doctrine takes its name from a pair of Supreme Court cases that placed a First Amendment limitation on the reach of the Sherman Act. *See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965). *Noerr-Pennington* provides broad immunity from liability to those who petition the government, including administrative agencies and courts, for redress of their grievances. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). Although *Noerr-Pennington* is a powerful shield, it is not absolute. *Noerr* itself recognized "[t]here may be situations" in which a petition "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." *Noerr*, 365 U.S. at 144. And so spawned the "sham" exception.

Two Supreme Court cases have explored the contours of this exception. In *California Motor*, the respondents, a group of highway carriers, alleged that the petitioners, another group of highway carriers, engaged in anticompetitive conduct by instituting state and federal proceedings to defeat the respondents' applications for operating rights. 404 U.S. at 509. The Court held that the

---

[12] Although the District Court did not discuss *Noerr-Pennington*, we will address this issue in the first instance because it raises questions of law over which we exercise plenary review and has been fully briefed by the parties. *See Hudson United Bank v. LiTenda Mortg. Corp.*, 142 F.3d 151, 159 (3d Cir. 1998). The same goes for Defendants' other arguments for dismissal, which we discuss further below.

28

complaint demonstrated a sham because it contained allegations that respondents "sought to bar their competitors from meaningful access to adjudicatory tribunals and . . . to usurp that decisionmaking process" by "institut[ing] the proceedings and actions . . . with or without probable cause, and regardless of the merits of the cases." *Id.* at 512 (internal quotation marks omitted). In other words, the allegations, if proven, showed that the "administrative and judicial processes have been abused." *Id.* at 513.

The Court returned to the exception in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993). There, after the respondents filed a single copyright suit against the petitioners, the petitioners responded with an antitrust action, dubbing the copyright suit a sham. The Supreme Court outlined a two-part definition of sham litigation. *Id.* at 60. First, "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* The existence of probable cause to institute the legal proceeding irrefutably demonstrates that the antitrust plaintiff has not proved the objective prong. *Id.* at 63. If the antitrust plaintiff fails to satisfy the objective prong, the analysis ends and the defendant is immune from suit. Only if the underlying litigation is objectively meritless does the court address the second factor: the litigant's subjective motivations. *Id.* at 60. Under this second part of the test, the court asks whether "the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor . . . through the use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *Id.* at 60-61 (citations and internal quotation marks omitted).

29

Following *California Motor* and *Professional Real Estate*, questions arise as to the relationship between these two cases. Hanover Realty argues that, because Defendants filed a series of petitions without regard to merit, its allegations are in line with those from *California Motor*. Defendants respond by pointing to the Supreme Court's more recent two-step analysis in *Professional Real Estate*, arguing that we must find each petition objectively baseless before assessing Defendants' subjective motivations.[13]

Three other Courts of Appeals have reconciled

---

[13] Defendants maintain that Hanover Realty waived its argument regarding applying the *California Motor* analysis because it never raised this issue before the District Court and it did not raise the issue on appeal until its supplemental reply brief. *See Gardiner v. V.I. Water & Power Auth.*, 145 F.3d 635, 646-47 (3d Cir. 1998). Defendants argue that, before the District Court, Hanover Realty agreed it had to satisfy the test from *Professional Real Estate*. We disagree that Hanover Realty has waived this argument. Throughout this litigation Defendants have consistently argued for *Noerr-Pennington* immunity and Hanover Realty has consistently responded that the sham exception applies. Hanover Realty's failure to cite particular cases within its broader argument for the sham exception does not amount to a waiver. Moreover, by alleging an "illegal scheme" through a "series of sham litigations," Hanover Realty put Defendants on notice of the relevant facts supporting its theory under *California Motor*. App. 63. Finally, Defendants have not been prejudiced by this argument because we exercise plenary review over this issue and they have filed a supplemental brief responding to Hanover Realty's position.

*California Motor* and *Professional Real Estate* by concluding that they apply to different situations: *California Motor* to a series of sham petitions and *Professional Real Estate* to a single sham petition.[14] *See Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 363-364 (4th Cir. 2013); *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 101 (2d Cir. 2000); *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 810-11 (9th Cir. 1994).

In the first case to tackle this issue, the Ninth Circuit explained that, in its view, the two-step inquiry in *Professional Real Estate* applies to the evaluation of a single suit or legal proceeding. *USS-POSCO*, 31 F.3d at 810-11. In such a case, the analysis is retrospective: if the alleged sham petition is not objectively baseless, defendants are immune— end of story. *See id.* at 811. *California Motor*, by contrast, is concerned with a defendant who brings a series of legal proceedings. The Supreme Court there "recognized that the filing of a whole series of lawsuits and other legal actions without regard to the merits has far more serious implications than filing a single action." *Id.* Thus, when faced with a series or pattern of lawsuits, "the question is not whether any one of them has merit—some may turn out to, just as a matter

---

[14] A staff report from the Federal Trade Commission also agrees with this view. *See* Federal Trade Commission, Enforcement Perspectives on the *Noerr-Pennington* Doctrine, at 28-38 (2006) ("FTC Report"), *available at* https://www.ftc.gov/sites/default/files/documents/advocacy_documents/ftc-staff-report-concerning-enforcement-perspectives-noerr-pennington-doctrine/p013518enfperspectnoerr-penningtondoctrine.pdf.

of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." *Id.* Unlike the inquiry from *Professional Real Estate*, this inquiry is prospective and asks whether the legal filings were made, "not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment." *Id.*

We agree with the approach to *California Motor* and *Professional Real Estate* that has been adopted by the Second, Fourth, and Ninth Circuits. As stated in *Noerr* itself, the ultimate purpose of this inquiry is to determine whether the petitioning activity is a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noerr*, 365 U.S. at 144. The best way to make that determination depends on whether there is a single filing or a series of filings. Where there is only one alleged sham petition, *Professional Real Estate*'s exacting two-step test properly places a heavy thumb on the scale in favor of the defendant. With only one "data point," it is difficult to determine with any precision whether the petition was anticompetitive. *See* FTC Report at 35. Thus, *Professional Real Estate* requires a showing of objective baselessness before looking into subjective motivations in order to prevent any undue chilling of First Amendment activity. In contrast, a more flexible standard is appropriate when dealing with a pattern of petitioning. Not only do pattern cases often involve more complex fact sets and a greater risk of antitrust harm, but the reviewing court sits in a much better position to assess whether a defendant has misused the governmental process to curtail competition. As a result, even if a small number of the petitions turn out to have some objective merit, that should

32

not automatically immunize defendants from liability.  *See USS-POSCO*, 31 F.3d at 811 ("[E]ven a broken clock is right twice a day.").

Accordingly, when a party alleges a series of legal proceedings, we conclude that the sham litigation standard from *California Motor* should govern.  This inquiry asks whether a series of petitions were filed with or without regard to merit and for the purpose of using the governmental process (as opposed to the outcome of that process) to harm a market rival and restrain trade.  In deciding whether there was such a policy of filing petitions with or without regard to merit, a court should perform a holistic review that may include looking at the defendant's filing success—i.e., win-loss percentage—as circumstantial evidence of the defendant's subjective motivations.  *Compare Waugh*, 728 F.3d at 365 (finding sham where one of fourteen proceedings was successful), *with USS-POSCO*, 31 F.3d at 811 (finding no sham where fifteen of twenty-nine lawsuits were successful), *and Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1046 (9th Cir. 2009) (finding no sham where defendant "won seven of the seventeen suits" and each of the ten remaining cases "had a plausible argument on which it could have prevailed").  If more than an insignificant number of filings have objective merit, a defendant likely did not have a policy of filing "willy-nilly without regard to success."  *See USS-POSCO*, 31 F.3d at 811.  A high percentage of meritless or objectively baseless proceedings, on the other hand, will tend to support a finding that the filings were not brought to redress any actual grievances.  *See City of Columbia v. Omni Outdoor Adver.*, 499 U.S. 365, 380 (1991) (explaining that "the filing of frivolous objections . . . simply in order to impose expense and delay" is the "classic example" of a sham).  Courts should also consider other

evidence of bad-faith as well as the magnitude and nature of the collateral harm imposed on plaintiffs by defendants' petitioning activity (e.g., abuses of the discovery process and interference with access to governmental agencies). *See Professional Real Estate*, 508 U.S. at 68 (Stevens, J., concurring).

Defendants argue as a threshold matter that the four actions they filed against Hanover Realty are too few to even qualify as a pattern or series. We are not convinced. In so concluding, we do not set a minimum number requirement for the applicability of *California Motor* or find that four sham petitions will always support the use of *California Motor*. It is sufficient for our purposes that four petitions were filed against Hanover Realty and it alleges that Defendants filed these sham proceedings at every opportunity to obstruct Hanover Realty from "obtaining all necessary government approvals." App. 71.

Turning to Hanover Realty's allegations, we conclude it can establish that Defendants had a policy of filing anticompetitive sham petitions. Defendants' challenge to the Flood Permit was objectively baseless. The Environmental Department issued Hanover Realty its permit and found that ShopRite had only a generalized property interest and its claim of greater competition did not demonstrate it was an aggrieved party. Courts have "consistently" rejected the types of arguments offered by Defendants, the Environmental Department explained. App. 157. In addition to the lack of objective merit, Hanover Realty alleges indicia of bad faith. For example, it alleges that, five months after they submitted a request for an adjudicatory hearing, Defendants filed an amended request with "new" proposed facts that were already known to Defendants at the time they submitted their initial

34

request. The "only basis" for this filing, Hanover Realty alleges, was to slow down the review process. App. 76. Defendants' alleged tactic suggests they were more interested in delay than in redressing any grievances.

Similarly, with respect to the action in lieu of prerogative writs, the New Jersey state court easily found that ShopRite was not an interested party because it failed to show how any of its rights would be affected by the approval of Hanover Realty's site plan. The court dismissed the complaint. We agree that Defendants' arguments for why they had standing are objectively baseless. Hanover Realty also alleges that Defendants filed three amended complaints only for the purpose of delay. This allegation indicates that Defendants' complaint was not brought out of a genuine desire to obtain relief, but rather to keep the suit pending as long as possible.

Defendants claim two victorious moments with respect to the Wetlands Permit. They first point to the fact that they successfully identified a technical deficiency in the application, and that the Environmental Department required Hanover Realty to correct this administrative error. We liken this to hitting a single in the second inning. Hanover Realty submitted a new application within days and the problem was resolved. *See Waugh*, 728 F.3d at 365 ("[T]he fact that there may be moments of merit within a series of lawsuits is not inconsistent with a campaign of sham litigation."). Defendants also remind us that the Environmental Department required Hanover Realty to conduct a survey for the presence of Indiana bats, as it had requested. But this also does not qualify as success. The ostensible goal of Defendants' challenge was for the Environmental Department to deny the Wetlands Permit. They were unsuccessful on that

front; Hanover Realty received the permit. Hanover Realty also alleges subjective evidence of abusing the governmental process. Defendants allegedly complained to the United States Fish and Wildlife Service even though they knew the wetlands at issue are not federally regulated waters. Moreover, in an email, Defendants' ecological consultant touted its ability to delay the permit approval process.

Defendants arguably fared slightly better in connection with their challenge to the Street Permit. They submitted objections to the Department of Transportation arguing, among other things, that Hanover Realty was required to build an overpass over a highway before beginning construction. In its letter responding to the parties, the Department of Transportation did acknowledge that it was required to consider any data or arguments submitted by third parties. Defendants extract success from that statement, but we do not. That the Department of Transportation was required to consider Defendants' challenge does not mean that their arguments had any bite. Where Defendants did have some success, however, was in the Department of Transportation's finding that the prior developer's agreement triggered the need for additional highway improvements. But, rather than requiring Hanover Realty to make those improvements, the letter recognized that such construction might not be feasible or worthwhile. It therefore recommended that Hanover Realty negotiate a modification to the agreement with the Department of Transportation before proceeding any further. This action was a partial success because Defendants' challenge did have some merit, but it did not cause the Department of Transportation to actually reject the permit application.

All in all, the allegations and the record show that

Hanover Realty received the Flood and Wetlands Permits, it got the state-court action dismissed, and it avoided having to make significant highway improvements. Defendants' meager record on the merits supports Hanover Realty's allegation that that the filings were not brought to redress any grievances. Nor have Defendants articulated any genuine interest in flooding or traffic near the proposed Wegmans (which is two miles away from the ShopRite), or in protecting the Indiana bat. Rather, Hanover Realty sufficiently alleges that Defendants brought these actions under a policy of harassment with the effect of obstructing Hanover Realty's access to governmental bodies. The filings have imposed significant expense on Hanover Realty, have continued to delay the project, and threaten the viability of the project altogether. That Defendants have had some insignificant success along the way does not alter the analysis when reviewing a pattern or series of proceedings. Accordingly, Hanover Realty can establish that the sham exception to *Noerr-Pennington* immunity applies because it sufficiently alleges that Defendants "instituted the proceedings and actions . . . with or without probable cause, and regardless of the merits of the cases." *Cal. Motor*, 404 U.S. at 516.[15]

### C.    Remaining Arguments

---

[15] Defendants also argue that, because some of the proceedings are ongoing, Hanover Realty's suit is premature. We reject this argument because the *California Motor* analysis is prospective, not retrospective. *See USS-POSCO*, 31 F.3d at 810-11. If we were to agree with Defendants on this point, they could keep filing petitions and avoid judicial review indefinitely.

Defendants contend that Hanover Realty has failed to allege facts showing that there is a "dangerous probability of [Defendants] achieving monopoly power." *W. Penn Allegheny*, 627 F.3d at 108. In support of this position, Defendants argue that Hanover Realty has not adequately alleged a product or geographic market.[16]

According to Defendants, Hanover Realty has not properly defined the alleged product market for full-service supermarkets because it has not distinguished full-service supermarkets from any other supermarkets or grocery stores. Defendants believe this supposed submarket is a contrivance. We disagree. "Competing products are in the same market if they are readily substitutable for one another; a market's outer boundaries are determined by the reasonable interchangeability of use between a product and its substitute, or by the cross-elasticity of demand." *Broadcom*, 501 F.3d at 307 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). Moreover, "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). We cannot say, at this very early stage in the litigation, that Hanover Realty's product market is implausible. Hanover Realty alleges that full-service supermarkets are distinct from other grocery suppliers because they provide customers with additional amenities,

---

[16] Because we already found that Hanover Realty does not have antitrust standing for its claim of attempted monopolization of the full-service supermarket shopping center market (Count Two), we address here only the claim relating to full-service supermarkets (Count One).

including prepared foods to go, on-site dining options, wine and liquor, specialty products, and other services such as pharmacies, banks, and fitness centers. Hanover Realty further alleges that consumers have come to enjoy full-service supermarkets as a one-stop shopping experience that allows them to avoid driving to different stores to check off the items on their grocery lists. Because consumers plausibly treat full-service supermarkets as a distinct submarket, the allegations here support the position that the market for full-service supermarkets "encompass[es] all interchangeable substitute products." *Id.* Through discovery, Hanover Realty may be able to demonstrate that a price increase at the ShopRite would not cause consumers to shop at other more traditional grocery stores.

Defendants also argue that the proposed geographic market—greater Morristown—is too imprecise. In Defendants' view, Hanover Realty has not alleged facts suggesting that ShopRite could raise prices without causing consumers to drive elsewhere. Again, we disagree. "[T]he relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks." *Eichorn v. AT&T Corp.*, 248 F.3d 131, 147 (3d Cir. 2001) (internal quotation marks omitted). Hanover Realty alleges that, when it comes to buying groceries, consumers like to shop near their homes. Thus, it alleges, proximity to a large upscale population is an important factor in determining where to locate a full-service supermarket. We find it plausible that greater Morristown, which includes Morristown and its neighboring communities, is a distinct geographic market. If the ShopRite in Morristown raised its prices, it is plausible that only the most diligent and frugal customer

would move his or her grocery shopping to a more distant supermarket.[17]

## III. CONCLUSION

For the foregoing reasons, we will affirm in part, vacate in part, and remand to the District Court for further proceedings consistent with this opinion.

---

[17] We have considered and rejected Defendants' remaining arguments. They argue there is no dangerous probability of achieving a monopoly because there is another full-service supermarket in the area—the Stop & Shop of Morris Plains. Defendants maintain that Hanover Realty has admitted this fact. But in making that argument, Defendants rely on Hanover Realty's initial complaint, not its amended complaint, which is operative. In the amended complaint, Hanover Realty alleges that the Stop & Shop is a "grocery store," App. 72, and that ShopRite is the "only full-service supermarket" in Greater Morristown, App. 73. We must accept those allegations as true. Defendants' final argument is that Hanover Realty has failed to allege a specific intent to monopolize. For the reasons discussed above in connection with the *Noerr-Pennington* doctrine, we conclude Hanover Realty sufficiently alleges that Defendants filed a series of sham proceedings with the intent to interfere with a prospective competitor and restrain trade.

Hanover 3201 Realty LLC v. Village Supermarkets
No. 14-4183

---

AMBRO, Circuit Judge, dissenting in part and concurring in part.

I respectfully disagree with my colleagues' view that Hanover 3201 Realty has suffered antitrust injury, a necessary component of antitrust standing. In my view, because the anticompetitive effects of Village Supermarkets' actions (as opposed to the damages sustained directly from any tort) do not hurt Hanover, a landlord and not a player in the market for full-service supermarkets, it lacks antitrust standing to bring this suit.

However, I recognize that my colleagues' view of antitrust standing is, by virtue of their ruling, the holding of our Court and now the law of this Circuit. In this context, I believe I am obliged to consider the merits of Hanover's suit. Among other things, I agree with Judge Fuentes that Village's *Noerr–Pennington* immunity defense is a sham and hence unavailing at this stage. Thus I vote to vacate the judgment of the District Court and remand.

This sets the stage for a most interesting interplay of whether to vote by issue (in which case Hanover wins, as, while I lose on the issue of standing, I align with Judge Fuentes on the lack of merit for Village's claim of immunity under *Noerr-Pennington*) or outcome (whereby Village wins, as my outcome, though for different reasons, aligns with Judge Greenberg's). I opt for the former for the reasons noted below.

## I. Hanover Lacks Antitrust Standing

### A. Law of Antitrust Injury

In order to state a claim for violation of the antitrust laws, a plaintiff must show that it has suffered "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Antitrust injury is a necessary but not sufficient component of antitrust standing, a prudential limitation on the Clayton Act's broad language concerning the right to sue. *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997).

We have held that a plaintiff ordinarily does not suffer "antitrust injury" if it is "not a competitor or a consumer in the market allegedly restrained," *id.* at 181, unless "there exists a 'significant causal connection' such that the harm to the plaintiff . . . [is] 'inextricably intertwined' with the antitrust conspiracy," *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993) (quoting *Blue Shield v. McCready,* 457 U.S. 465, 484 (1982)). This exception is narrow, and antitrust injury is "almost exclusively suffered by consumers or competitors." *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 926 (3d Cir. 1999).[1]

---

[1] Our law that a plaintiff ought to be a consumer or competitor and that the "inextricably intertwined" injury presents a limited "exception" to this "requirement" is not the only way to read the relevant Supreme Court cases. The leading case on antitrust standing treated consumer-or-

My principal disagreement with my colleagues concerns how to read the "inextricably intertwined" exception. As I understand their opinion, they hew closely to the meaning of those two particular words and believe that a plaintiff has suffered an antitrust injury if its injury is closely related to a defendant's actions that also amount to an antitrust violation. By contrast, I believe the rule remains that "antitrust injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick*, 429 U.S. at 489. In my view, even if a plaintiff has suffered direct harm from a defendant's acts, and even if those acts violate the antitrust laws, it has not suffered antitrust injury unless its own harm stems from the anticompetitive consequences of the defendant's conduct.

As the majority notes, the "inextricably intertwined" language comes from the Supreme Court's decision in *McCready*, a case with exceptionally broad *dicta* about antitrust standing. In that case, the plaintiff, who was insured by Blue Shield, saw a psychologist. *McCready*, 457 U.S. at 468. Blue Shield allegedly colluded with psychiatrists to divert patients like McCready from psychologists by declining to reimburse the latter's services. *Id.* at 469–70. It argued that McCready had not suffered antitrust injury because neither psychiatrists' nor psychologists' prices

competitor status as one of several factors a court should weigh in considering whether a plaintiff has antitrust standing, *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 539 (1983), and in other circuits consumer-or-competitor status is less strongly emphasized. *See, e.g.*, *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311 (4th Cir. 2007). However, it is the settled law of our Court.

increased as a result of its scheme (ignoring the *de facto* price increase of the insurance company's failure to reimburse the insured), *id. at* 481–84, and that the point of the alleged scheme was to harm psychologists, not their insured patients, *id. at* 478–79.[2] But the Supreme Court held that "[a]lthough McCready was not a competitor of the conspirators [psychiatrists and Blue Shield], the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." 457 U.S. at 483–84.

The reason McCready's injury was inextricably intertwined with the harm inflicted on the psychotherapy market was that she was a consumer in that market and her "injuries [were] the essential means by which defendants' illegal conduct brought about its ultimate injury to the marketplace." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 237 n.21 (3d Cir. 2013) (quoting IIA Philip E. Areeda, et al., *Antitrust Law* ¶ 339, at 123 (3d ed. 2007)). However, the term "essential means" does not mean that anyone who suffers *any* injury in the context of an anticompetitive scheme may sue under the antitrust laws. In *McCready*, although the plaintiff was not the ultimate target of the cartel's activity, Blue Shield and the psychiatrists used a classic antitrust harm—increased prices—as a fulcrum to distort the psychotherapy market, specifically to the detriment of psychologists. The *McCready* Court affirmed that a person who suffers antitrust injury— *i.e.*, who is injured because of

---

[2] Blue Shield's argument was based in part on a now-outmoded theory that only the "target" of an antitrust violation could bring suit. *Id.* at 478 n.14 & 479 n.15; *see also Associated Gen. Contractors*, 459 U.S. at 536 n.33 (rejecting "target area" theory).

the anticompetitive effects of a cartel or monopolist's activity—may bring suit even if that person is not a consumer from whom the defendant seeks to extract supracompetitive rents or a competitor the defendant seeks to eliminate. *See* IIA Areeda, *supra*, ¶ 339, at 144 (4th ed. 2014) ("[T]he result of the alleged antitrust conspiracy would be higher prices in the very market in which McCready was a purchaser. . . . McCready is thus like a purchaser from a cartel at cartel prices.").

### B. *Hanover Has Not Suffered Antitrust Injury*

Here, Hanover alleges monopolization of two markets, one for "full service supermarkets," and one for "full service supermarket shopping centers," the latter defined as the market for real property that can be used for full-service supermarkets. It does not participate in the supermarket business; it is a landlord and developer. It operates a development enterprise in the real-estate market, but it does not sell goods or provide consumer services the way Village does. And although Hanover does participate in the market for real property that can be used for full-service supermarkets, Village's actions have not affected that market. In other words, Hanover does not participate in the market that was allegedly restrained, and the market it does participate in was not restrained. Hanover has thus not suffered an antitrust injury.

### 1. Full-service Supermarket Market

Unlike the relationship in *McCready* between the plaintiff and the market for psychotherapy services, whether the market for full-service supermarkets is ultimately restrained does not matter to Hanover. Its injuries flow from Village's alleged wrongful use of civil proceedings and from

Hanover's contract with Wegmans that allocated to Hanover some portion of the risk of failing to develop the parcel within a certain period of time. Village's alleged attempted monopolization of the relevant markets hurts Wegmans, a full-service supermarket, and it hurts consumers who would prefer a choice among supermarkets, but as Village is not alleged to have restrained the market for real estate in Morristown or anywhere else, it is hard to see why Hanover is a proper *antitrust* plaintiff even if it has valid tort claims arising out of otherwise anticompetitive conduct. In short, because the anticompetitive effects of Village's allegedly illegal activity have not caused any injury to Hanover, it does not have an antitrust claim.

Several sources of authority support the notion that a landlord is an improper antitrust plaintiff when it complains of injury flowing from antitrust harm directed at a tenant. The leading treatise deals with the situation in one terse paragraph: "The landlord receiving a set rather than variable rent is simply a supplier of an input . . . . Such landlords are almost always denied standing for antitrust violations that target their tenants or that occur in the product market." IIA Areeda, *supra*, ¶ 351c, at 286. We have also disposed of claims brought by landlords without much analysis beyond indicating that any injury the landlord suffered, even when its rent was tied to the tenant's revenue, was too remote from the antitrust violation to allow the landlord to bring suit.

> [A] non-operating lessor-owner of a motion picture theatre who is entitled to rental based on a percentage of receipts is nonetheless not a "person . . . injured in his business or property" within the meaning of section 4 of the Clayton Act, 15 U.S.C. § 15, and, therefore, is not entitled to bring suit under the Act for an alleged conspiracy relating to the licensing of

6

pictures at the theatre by the lessee-operator.

*Melrose Realty Co. v. Loew's, Inc.*, 234 F.2d 518, 519 (3d Cir. 1956) (per curiam); *see also Harrison v. Paramount Pictures, Inc.*, 211 F.2d 405, 405 (3d Cir. 1954) (affirming for the reasons stated in the District Court's opinion, *see* 115 F. Supp. 312 (E.D. Pa. 1953), which held that a movie theater lessor was too remote from antitrust harm directed at movie distributors). More recently, we held that "[a] supplier does not suffer an antitrust injury when competition is reduced in the downstream market in which it sells goods or services." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010). And a landlord is in the same shoes as a supplier from an antitrust-injury perspective. IIA Areeda, *supra*, ¶ 351c at 286.

Other courts of appeals that have faced facts similar to our case have rejected the landlord's standing. Most closely on point is *Serfecz v. Jewel Food Stores*, 67 F.3d 591 (7th Cir. 1995), where owners and operators of a shopping mall sought to recover damages from an anchor tenant, a grocery store. The tenant opened another store nearby, vacated its old premises, and would not sublease them to another grocery store. The Seventh Circuit Court held that the "plaintiffs d[id] not have the requisite direct injury to have standing to assert that [the defendant] ha[d] monopolized, or conspired with others to monopolize, the retail grocery market," *id.* at 598–99, because plaintiffs were players in the shopping center market, not the retail grocery business.

Similarly, in a Sixth Circuit case a grocery store subleased to a competitor grocery store and then engaged in anticompetitive conduct to ruin it. *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1081 (6th Cir. 1983). The plaintiff, a landlord that owned the rest of the shopping center of which the grocery store was a part, found a

7

replacement grocery store, but the defendant would not sublease to it, presumably lowering the value of the shopping center. The Court noted that "Southaven's [the land owner's] injury [was] charged to have accrued as a result of its contract negotiations with the alleged antitrust violator. The complaint noticeably fail[ed] to aver that Southaven sustained any injury as a competitor, purchaser, consumer or other economic actor in the grocery industry." *Id*. at 1081. Ultimately, the Court held that as "Southaven is not a consumer, customer, competitor or participant in the relevant market or otherwise inextricably intertwined with any such entity[, i]ts injury [was] not sufficiently linked to the pro-competitive policy of the antitrust laws" to confer standing on it. *Id.* at 1087; *accord Rosenberg v. Cleary, Gottlieb, Steen & Hamilton*, 598 F. Supp. 642, 645–46 (S.D.N.Y. 1984) ("No matter how causal a relationship may exist between the alleged violation and injury, the defendants' actions were not undertaken to interfere with the economic freedom of participants in the construction business.").

Because I read the Supreme Court's and our cases on antitrust standing to require a plaintiff's harm to be at least "inextricably intertwined" with whatever makes a defendant's conduct specifically an antitrust violation—*e.g.*, higher prices or reduced output—I believe Hanover lacks standing with respect to the allegedly unlawful restraint of the full-service supermarket market. Hence I respectfully dissent from the decision of my colleagues to reverse on this issue.

### 2. Full-Service Supermarket Shopping Center Market

Hanover also alleges that it competes directly with H&H, the special purpose entity that owns the land for Village's supermarket, in the "full service supermarket shopping center market" of greater Morristown. This title for

the market, besides being a mouthful, is confusing, as the market players are said to be landowners "whose property is or can be utilized by or rented to a full-service supermarket." Am. Compl. ¶ 32, J.A. 69. Thus the market is for certain real property. The *Serfecz* plaintiffs, who lacked standing insofar as they alleged monopolization of the retail grocery market, nevertheless had standing with respect to the shopping center market. 67 F.3d at 599. This was because they had ownership interests in a mall, and the defendant (a former anchor tenant and grocery store) allegedly colluded with a different shopping center to drive Serfecz's mall out of business. *Id.* at 595, 599. Hanover argues that H&H and Village are trying to keep Hanover out of the full-service supermarket shopping center market in the same way that the *Serfecz* defendants allegedly drove the plaintiffs out of the mall business.

Unlike the plaintiffs in *Serfecz*, neither Hanover nor H&H is specifically in the business of operating shopping centers. Instead, they are owners and developers of real property. Hanover does not allege, for example, that its parcel's value decreased following Village and H&H's attempts to exclude competitors from the market for owning land on which supermarkets can be leased. And the Complaint does not allege that Village's efforts have affected the market for real property in Morristown or anywhere else to any significant degree. As Hanover has not plausibly alleged that Village's monopolistic conduct has injured it as a landowner, it cannot be said that the frustration of its contract with Wegmans "reflect[s] the anticompetitive effect . . . of the violation." *Brunswick*, 429 U.S. at 489; *cf.* IIA Areeda, *supra*, ¶ 351b1, at 284 ("In the movies cases, for example, the defendant's conduct . . . depriv[ed] rival film producers, distributors, or exhibitors of adequate access to markets or supplies. The landlord is a stranger to those interests: the real estate market as a whole is not significantly affected.").

9

Thus, and for the reasons ably expressed in Part II.A.2 of Judge Fuentes' opinion, I agree that Hanover lacks antitrust standing with respect to what it calls the full-service supermarket shopping center market.

## II.    Noerr–Pennington and Remaining Issues

I agree with Judge Fuentes' views on *Noerr–Pennington* and Village's other objections to Hanover's Complaint.  Hence I join Part II.B–C of his opinion.

## III.    How to Decide This Case?

This case presents what academic literature terms a "voting paradox."  On the one hand, two judges (Judge Greenberg and I) believe that the outcome should be that Hanover's suit not proceed, though we do so for different reasons.  However, one majority of this Court (Judges Fuentes and Greenberg) believes that Hanover has antitrust standing (I do not because I do not discern antitrust injury), while another majority (Judge Fuentes and I) believes that Hanover should survive Village's motion to dismiss (assuming it has antitrust standing).  The paradox is that, if I vote on the judgment of this case (affirm or reverse) based on my individual views, a majority of the Court will have ruled against the prevailing party on each relevant issue, meaning that our Court's reasoning would not support its judgment.  However, if I follow, despite my dissent, Judge Fuentes and Greenberg on the antitrust standing issue, my individual vote would be inconsistent with my view of who should win were I alone ruling.

But to me it is significant that we are not acting alone.  Because we need to act as a Court, I think it is more appropriate for me to be bound by the majority's opinion on antitrust standing despite my disagreement with it.  Before I

explain my choice in detail, I shall survey the current state of thinking on this issue.

### *A.* *Law and Scholarship on the Voting Paradox*

Although I do not write on an entirely blank slate with respect to this issue, there is surprisingly little discussion in judicial opinions about how one ought to vote when facing such a paradox. Where a majority agrees on the bottom-line outcome in a case, shifting majorities with varied lines of reasoning are more common; these variable groups unquestionably describe the holdings of the relevant courts. *See, e.g.*, *United States v. Booker*, 543 U.S. 220 (2005) (resolving whether there was a constitutional violation by one majority per Justice Stevens over Justice Breyer's dissent but ordering remedy via a different majority per Justice Breyer over Justice Stevens' dissent); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 302 (3d Cir. 2014) ("Although a majority of the Court thus does not accept the District Court's ruling that CBP did not have standing, this conclusion does not change our outcome in light of a different majority's independent conclusion that the Court properly entered summary judgment against the plaintiffs."); *United States v. Aguila-Montes de Oca*, 655 F.3d 915, 916 (9th Cir. 2011); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004) (en banc); *United States v. Johnson*, 256 F.3d 895, 897 (9th Cir. 2001) (en banc); *Davis v. U.S. Steel Corp.*, 779 F.2d 209, 210 (4th Cir. 1985).

It is thus commonplace that majorities composed of different allotments of judges lay down the law, and it would seem to follow that a judge may vote on a judgment based on the relevant court's legal conclusions even if the judge disagrees with the court's resolution of a dispositive issue. However, it is quite rare that judges are actually faced with a voting paradox where it is debatable whether the proper result

11

is to vote according to the judge's personal preference or to vote according to shifting majorities' statements of the law. In three Supreme Court cases, justices have noted that their votes on the judgment were inconsistent with their individual views of the proper outcome of the case. *Arizona v. Fulminante*, 499 U.S. 279, 313 (1991) (Kennedy, J., concurring in the judgment); *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 45 (1989) (White, J., concurring in the judgment in part and dissenting in part); *United States v. Vuitch*, 402 U.S. 62, 96 (1971) (Harlan, J., dissenting as to jurisdiction); *id.* at 97 (opinion of Blackmun, J.).

*Fulminante* and *Vuitch* are especially relevant. In the former case, the Arizona Supreme Court held that a confession was coerced and thus inadmissible. *State v. Fulminante*, 778 P.2d 602, 627 (Ariz. 1988), *aff'd,* 499 U.S. 279 (1991). In deciding whether to affirm or reverse, the U.S. Supreme Court faced three issues: (1) whether the defendant's confession was coerced; (2) if so, whether harmless error analysis applied; and (3) if so, whether the admission of the confession was harmless error. *Fulminante*, 499 U.S. at 279, 282, 295. Five justices concluded the confession was coerced, *id.* at 287; a different group of five justices concluded harmless error applies to coerced confessions, *id.* at 311–12; and still a third group of five held that the admission there was not harmless, *id.* at 302. At the same time, five justices thought the Arizona Supreme Court should have been reversed, though for no consistent reason. *See id.* at 306 (opinion of Rehnquist, C.J., that confession was not coerced, joined by O'Connor, Kennedy & Souter, JJ.); *id.* at 312 (opinion of Rehnquist, C.J., joined by Scalia, J., that admission of confession was harmless). Justice Kennedy yielded to the majority on the question of whether the confession was coerced and thus reached the harmless-error issue; he concluded the admission was not harmless and thus supported the judgment affirming the Arizona Supreme

12

Court. *Id.* at 313–14. Likewise, in *Vuitch* Justices Harlan and Blackmun acceded to a majority's disposition as to jurisdiction, but—together with other justices—formed a separate majority on the merits. 402 U.S. at 96, 97.[3]

Similarly, in the panel opinion of *United States v. Andis*, 277 F.3d 984, 985 (8th Cir. 2002), *rev'd*, 333 F.3d 886 (8th Cir. 2003) (en banc), two judges held that the right to

---

[3] *Union Gas* is less squarely on point because no majority supported that judgment on every point. The issues were (1) whether two Congressional statutes were intended to abrogate state sovereign immunity and (2) whether Congress had that power under the Commerce Clause. 491 U.S. at 5. Five justices held the statutes purported to annul state sovereign immunity and five that Congress had the power to do so. *Id.* at 13. However, only four justices agreed on a rationale for Congress's constitutional power. Justice White's cryptic concurrence stated on the constitutional question only that "I agree with the conclusion reached by Justice Brennan in Part III of his opinion, that Congress has the authority under Article I to abrogate the Eleventh Amendment immunity of the States, although I do not agree with much of his reasoning." *Union Gas Co.*, 491 U.S. at 57 (White, J., concurring in the judgment in part and dissenting in part). It was this absence of reasoning—not, as Judge Greenberg's dissent suggests, Justice White's yielding to his colleagues on the statutory interpretation question—that caused the "confusion" noted in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 64 (1996) ("Justice White, who provided the fifth vote for the result, wrote separately in order to indicate his disagreement with the plurality's rationale.").

13

appeal an illegal sentence could not be waived, but a different majority held that the sentence should be vacated. Two judges, acting independently, would have affirmed the sentence—one because he viewed the waiver as valid and another because he thought the sentence was legal. *Id.* However, the judge who viewed the waiver as valid voted to remand the case for further proceedings because on the merits, assuming the issue was not waived, he believed the sentence was illegal. *Id.* at 989 (Morris Sheppard Arnold, J., dissenting in part and concurring in the judgment). This vote was made without much comment except that "otherwise the court could not issue a mandate." *Id.* (In fact, a mandate could have just as easily issued if the two judges preferring affirmance voted to affirm.)[4]

At the same time, there have been cases where judges or justices stick to their individual guns with the result that, although a majority supports a given judgment, a careful reading of all the opinions in the case reveals that no majority supports the prevailing party on any issue logically necessary

---

[4] There may also be some support for issue voting in our decision in *United States v. Bazzano*, 712 F.2d 826 (3d Cir. 1983) (en banc) (per curiam). In that case, nine of the ten judges would have voted to remand the case to the District Court. But no majority could agree on what the District Court should do on remand. *Id.* at 829 (noting that the "differing grounds on which these various votes for remand are rested cannot be reconciled so as to yield a majority vote for a remand with consistent instructions to the district court"). We thus affirmed the District Court's judgment, despite nine of the ten judges agreeing on the outcome, because no majority could agree on rationale.

14

to its victory. For example, *Miller v. Albright*, 523 U.S. 420 (1998), presented four questions, and shifting majorities of the Supreme Court sided with Miller on each one; nonetheless six justices, for differing reasons, thought Miller should lose, which she did. Maxwell L. Stearns, *Should Justices Ever Switch Votes? Miller v. Albright in Social Choice Perspective*, 7 Sup. Ct. Econ. Rev. 87, 102 (1999). To muddy the waters further, scholars believe that in other cases justices or judges have cast votes in favor of analyses with which they did not agree in order to mask voting paradoxes. *See, e.g.*, Michael Abramowicz & Maxwell L. Stearns, *Beyond Counting Votes: The Political Economy of Bush v. Gore*, 54 Vand. L. Rev. 1849, 1938–41 (2001).

Given this array of paradoxical (or potentially so) cases and the striking absence of analysis of how to vote in any of them, it is not surprising that there is no set rule on how an appellate judge should vote. Generally, scholars who analyze voting paradoxes (and there are several) discuss two possibilities: "issue voting" and "outcome voting." Broadly speaking, the former occurs when a judge surveys the holding on each question of law presented; a majority vote on any given issue counts as a holding of the court, and the remaining judge is bound by it as if it occurred in a prior precedential case.[5] The latter, and more common, scenario

---

[5] This equation of precedent with an issue is problematic in a court that has power to overrule its precedent, like the en banc Third Circuit or the Supreme Court. Indeed, when a panel is in a position to overrule prior precedent, a voting paradox may be more likely. *See* David S. Cohen, *The Precedent-Based Voting Paradox*, 90 B.U. L. Rev. 183, 184 (2010). Luckily, that is not the case with a panel of this Court. *See* Third Circuit I.O.P. 9.1 ("It is the tradition of this court that

occurs when a judge votes on the result of a case (affirm, vacate, reverse, *etc.*) according to his or her view of the proper outcome and without regard to the views of the other judges on a panel. Even if a careful reading of the judges' opinions in a case shows that a majority would rule for the losing party on each relevant issue, an outcome-vote, as that term is usually used in the relevant literature, results in a win for the party the majority of judges think should win regardless of reasoning.

Before discussing the pros and cons of each voting protocol, I note that one thing is clear: as a formal matter, judges vote on the result of a case, *i.e.*, whether to affirm, reverse, vacate, dismiss, remand, or some combination of these; otherwise, the clerk of a court could not enter judgment pursuant to Fed. R. App. P. 36. But even though "result" and "outcome" are synonyms, it does not follow that my vote on the disposition must be what I have just defined as an "outcome vote." I am aware of no source of law that tells me whether my vote must be based on how I view our Court's holding on each relevant issue or on how I personally view the best outcome of the case.

### B. An Issue Vote is Preferable Here

There are two closely related reasons why I choose to vote by issue in this case, and I will discuss them in turn: (1) the execution of our dual responsibilities to resolve disputes and declare the law; and (2) the role of a judge on a multimember court.

the holding of a panel in a precedential opinion is binding on subsequent panels. Thus, no subsequent panel overrules the holding in a precedential opinion of a previous panel. Court en banc consideration is required to do so.").

16

1.      Our Dual Responsibilities:  Dispute Resolution and Law Declaration

Those who sit on, appear before, or study federal courts are familiar with the notion that we serve two primary functions: dispute resolution and law declaration. The former role is rooted in the limitation that courts only decide "cases" and "controversies." U.S. Const., art. III, § 2. To carry out this role, a court issues judgments in the cases before it; in the case of an appellate court, the judgment, as noted, will usually be to affirm, reverse, vacate, dismiss, remand, or some combination thereof.

A court's second role is "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). This role flows directly from the first. "Those who apply the rule to particular cases . . . must of necessity expound and interpret that rule." *Id.* To fulfill its law-declaration function, a court often writes opinions explaining the law and reasoning underlying its judgments. *See also* Jonathan Remy Nash, *A Context-Sensitive Voting Protocol Paradigm for Multimember Courts*, 56 Stan. L. Rev. 75, 86–87 (2003) ("Courts function as arbiters of particular disputes between litigants. Those litigants are concerned with the outcome of the case as determined by the courts. But, in handing down decisions, courts serve another important role: They announce (or aid in the evolution and development of) generally applicable rules of law.").

To me, issue voting better accomplishes both roles by deciding all necessary (including threshold) issues and proceeding from that point to explain what the law is and why. By voting on issues, a multimember court announces discrete holdings that can be applied in later cases.

There is thus an obvious reason to vote on a case's

17

disposition based on the Court's resolution of each relevant issue—to align rationale and outcome. A related reason to do so is that voting paradoxes often arise because of the operation of the final-judgment rule. Nash, *supra*, at 84-85. Because legal rulings are usually not appealable before final judgments in most jurisdictions, appeals are more likely to present multiple issues that can create paradoxes, whereas if we heard appeals piecemeal, far less opportunity for voting problems would arise. The final-judgment rule is sound because it supports efficient resolution of cases at little cost: claims of reversible error can be preserved and, as a general matter, the litigant who is right on the law will prevail.

But that is not true if we allow the final judgment rule to affect our *substantive* resolution of the issues in a case. Take this case. Imagine that the final-judgment rule did not apply, and Hanover prevailed on antitrust standing in the District Court. Village then appealed, and we affirmed (over my dissent). Then, on remand, Village prevailed on the *Noerr–Pennington* issue in the District Court, and Hanover appealed and won (over Judge Greenberg's dissent). There would be no doubt in that case that Hanover would have properly won its appeals even though two judges thought at different phases of the litigation it should have lost, and no justification for the final-judgment rule requires a contrary bottom-line outcome in such a seriatim case. To generalize from that example, the final-judgment rule helps create the voting paradox without providing a satisfactory rationale for the usual practice of outcome voting, thus posing the question of why, other than habit, we typically vote by outcome.

Judge Greenberg points out that we could avoid the voting paradox if I didn't bother to reach the *Noerr–Pennington* issue. If so, a majority would conclude that Hanover had standing, and then a majority would conclude that Hanover loses but without a majority supporting any

18

particular reason for its loss. This avoids the problem of an incoherent precedent but replaces it with no opinion to provide even the hint of a rationale. Arguably, no reasoning is an improvement over reasoning that contradicts a judgment, but, as Judge Greenberg notes, we never have to issue an opinion. We could just issue judgment orders without reasoning in every case and save everyone a lot of time and paper. In my view, we issue judgments accompanied by reasoned opinions because the rule of law ought neither to be nor appear to be arbitrary. It follows that judgments should be supported by reasoning, that the reasoning should actually support the outcome in a particular case, and that in this case I should yield to my colleagues on antitrust standing and vote on the *Noerr-Pennington* issue that follows.

2. A Multimember Court: Deliberative Body or so Many Noses to Count?

The possibilities of issue and outcome voting expose a tension between the independence of individual judges and our membership on multimember panels of multimember courts. As we are independent, it could be thought that a litigant is entitled to the sum of independent votes in its favor and that a judge should not change his or her vote out of deference to colleagues' shared views. The widely (though not universally) accepted practice of writing separate opinions when a judge disagrees with another's analysis supports this view of voting one's views alone.

There are at least two reasons why appellate courts should be deemed to act as an entity reasoning through the case issue by issue rather than a collection of individual judges with a judgment reflecting a vote tally divorced from the reasoning of the majority of the court. The first is the nature of multimember appellate courts as collegial, and not

19

just redundant, enterprises. Kornhauser and Sager explain that redundant and collegial enterprises "aim to produce performances that could in principle represent the unenhanced effort of a single person, but to bring that performance closer to the ideal." Lewis A. Kornhauser & Lawrence G. Sager, *The One and the Many: Adjudication in Collegial Courts*, 81 Calif. L. Rev. 1, 4 (1993). Redundant enterprises "rely on an external structure of multiple independent efforts." *Id*. For example, in the case of gymnastics judges, "[e]ach judge ranks the performance before her without consulting her peers, and the rankings are aggregated by rule." *Id*. By contrast, collegial bodies "are like team enterprises in that each participant must consider and respond to her colleagues as she performs her tasks. Collaboration and deliberation are the trademarks of collegial enterprise." *Id*. "While interaction and exchange are irrelevant or even antithetical to redundant enterprises, they are crucial to collegial enterprises, and the product of a collegial enterprise often belongs to that enterprise in a uniquely collective way." *Id*. at 4–5.

Appellate courts are collegial enterprises. Judges collaborate on and deliberate about cases and issues at all levels of the appeals process, from deciding whether to hold oral argument to conferencing to circulating opinions. At the end of the process a judgment of the Court typically emerges supported by an opinion. In some sense that product is akin to what a team produces. "Team enterprises do not merely multiply product or amplify effort: they transform the performance into something that only a group could have produced." *Id*. at 3. Put another way, while an individual judge could do the job of an appellate court, the process of multimember panels produces a product that is typically better qualitatively than what an individual appellate judge

could do. The whole is greater than the sum of its parts.[6]

In some cases, then, outcome voting lessens the value of an appellate court's deliberative process. If judges engage in issue voting, there are multiple deliberations and votes; that is, there are deliberations and votes on each issue. A judge is not effectively on the sideline for disagreeing with the majority on a threshold issue. Applying issue voting in this case, for example, I reach the *Noerr–Pennington* issue, even though I perceive no standing, because my individual view on the antitrust standing question is subsumed (despite my filing a dissent) into that of the panel; we act as a single deliberative body in a process that produces a judgment that depends on the majority's reasoning (whatever the composition of that majority) at each step of the process. With outcome voting, by contrast, though judges deliberate on separate issues (unless they decide not to reach them), a judgment depends not on reasoning but a tallying of who should win were each judge to vote a result without reasons. There is, therefore, less of an opportunity for synthesis or transformation of each judge's reasoning into the larger whole. This provides the answer to Judge Greenberg's lack of "understand[ing] why the circumstance that we are all on the panel should lead to a different result than that which would be reached individually by a majority of the panel." Greenberg Op. at 29. The result should be different because we sit on a panel.

Second, issue voting treats judges as interchangeable—the premise of the black robe and an assumption on which our legal system is based. In our case, for example, Hanover prevails because two out of three judges find antitrust standing for the plaintiff and two out of

---

[6] This is not to say that judges should not dissent. In that sense, courts are not fully team enterprises.

21

three judges find no immunity for the defendant. Voting by issue better reflects our role as members of a single deliberative body striving to craft a sensible *corpus juris*. As noted above, if we voted by outcome, the precedential value of this case would be unclear if the same set of facts came before us (or a district court) a second time. For a body like a court that has no means to enforce its mandate other than persuasion, it is of great concern that "in cases where the doctrinal paradox arises, judgment and reason are immediately and inexorably pulled apart, to the potential detriment of the orderly development of legal doctrine." Kornhauser & Sager, *supra*, at 5.

### C.  *Arguments to the Contrary are Not Persuasive.*

Thoughtful proponents of an outcome-based voting protocol argue that it promotes principled (*i.e.*, not strategic) identification of issues and, at least in some cases, also promotes principled resolution of those issues. *See* Abramowicz & Stearns, *supra*, at 56–58; John M. Rogers, *"Issue Voting" by Multimember Appellate Courts: A Response to Some Radical Proposals*, 49 Vand. L. Rev. 997, 1002 (1996); Maxwell L. Stearns, *How Outcome Voting Promotes Principled Issue Identification: A Reply to Professor John Rogers and Others*, 49 Vand. L. Rev. 1045, 1050 (1996). In short, these scholars argue that if appellate courts vote by issue, judges and litigants will have an incentive to identify and sequence legal issues in disingenuous ways to cobble together shifting majorities that will eventually support their favored positions. By contrast, if the only vote is on the outcome, each judge will present the issues in the case as he or she actually views them without regard to the potential gains from gamesmanship in framing

issues.[7]

There are a number of replies to this argument. First, professional norms of the bench and bar go a long way in preventing deceptive strategies in brief- and opinion-writing. Second, it is unclear to me that the resolution of issues in an outcome-vote is more principled than in an issue vote; indeed, a principal problem with outcome voting is that occasionally

---

[7] Judge Greenberg also relies on an article by then-Professor Rogers, who concluded that "over 150 Supreme Court cases involving plurality majority opinions indicate that a justice should not [aggregate votes by issue and therefore] defer to a majority that disagrees on a dispositive issue." John M. Rogers, *"I Vote This Way Because I'm Wrong": The Supreme Court Justice as Epimenides*, 79 Ky. L.J. 439, 459 (1990–91). But not one of that large number of cases actually purports to say how a judge "should" vote. Moreover, by Judge Rogers' own count, only between fourteen and sixteen cases involved situations where the justices voted by outcome when an issue-vote would have yielded a different result. *Id.* at 448 & n.24. In light of the three cases where justices voted by issue and the Supreme Court's silence in all cases on whether issue- or outcome-based voting is preferable, I do not see how we can fairly understand the Court to have settled the question of the proper voting protocol. Kornhauser & Sager, *supra*, at 57 ("Current appellate practice with regard to paradoxical cases is in shambles. The Supreme Court, in particular, has been unmindful of the existence of the paradox, even when confronted with cases whose dispositions turn on the choice of alternative voting protocols.").

issues are left entirely unresolved.  For example, *Wedderburn v. I.N.S.*, 215 F.3d 795, 801 (7th Cir. 2000), applied *Miller*, 523 U.S. 420 (where, as noted above, majorities on every issue undermined the judgment), to reject a similar challenge to a different statute.  In *Wedderburn*, the Court reasoned not by legal analysis but by prediction about the votes of individual justices.  215 F.3d at 801.  Finally, each judge on a multimember panel always has to vote ultimately on the outcome of a case; what is debatable is whether that vote should be based on the way majorities of judges resolve individual issues or how the individual judge views the preferred outcome.  In some cases, like this one, where all agree on what the issues are, each relevant one is dispositive, and they all arise in an agreed-on logical sequence, issue-voting strikes me as preferable.  But I do not mean to promise that I will always vote by issue, and I do not mean to suggest that my colleagues should or must follow my lead.  As we have seen, Supreme Court justices are inconsistent in their voting bases, and no source of law resolves the question of how to vote.  And in some cases, especially capital ones, the practical implications of a judgment—life or death— may be more important than the choice of one voting protocol over another.  *See* David Post & Steven C. Salop, *Rowing Against the Tidewater: A Theory of Voting by Multijudge Panels*, 80 Geo. L.J. 743, 761 (1992).

>    ### D.      The Next Case: Toward a Voting Protocol Protocol

As we have seen, appellate judges have little to guide their discretion in choosing a voting protocol.  This case prompts me to argue for one guidepost:  when an appellant raises "arguments that would constitute independent appeals were interlocutory appeals permissible," issue voting is preferable.  Nash, *supra*, at 147–48.

Because in this case I view a coherent precedent from our Court as more valuable than a resolution in favor of the party I would have sided with were I deciding this case by myself, and because all agree the two issues presented here are easily separated, I concur with Judge Fuentes in a disposition that ultimately favors Hanover.

## IV.  Conclusion

Hanover should lack antitrust standing because it has not suffered antitrust injury within the meaning of the Supreme Court's exposition of that term.  However, I am outvoted on this issue, which sets the precedent for our Court and the predicate for addressing the remaining issue (*Noerr–Pennington*).  It has divided my colleagues, and thus my vote is needed to resolve it.  I agree with Judge Fuentes that *Noerr–Pennington* poses no bar to relief at this stage in the litigation.  Although I would affirm the District Court on antitrust standing grounds, I yield to my colleagues' resolution of that issue and vote to vacate and remand on the lack of a *Noerr-Pennington* defense to Village.

Re:  Hanover 3201 Realty, LLC v. Village Supermarkets,
     No. 14-4183

GREENBERG, Circuit Judge, dissenting.

I concur with and join in Sections I, the background section, and II.A., the antitrust standing section, of Judge Fuentes's opinion. Thus, I agree with his conclusion in Section II.A. that plaintiff, Hanover 3201 Realty, LLC ("3201 Realty"), has antitrust standing in the full-service supermarket market but not in the full-service supermarket rental space market. I cannot agree, however, with Judge Fuentes's opinion to the extent that I believe it expands the sham exception to Noerr-Pennington immunity. I decline to join in this aspect of Judge Fuentes's opinion because: (1) 3201 Realty has not properly preserved the issue; (2) no court of which I am aware has applied the expanded exception in circumstances comparable to those here; and (3) the expansion of the sham exception comes with a questionable pedigree. I therefore conclude that the legal challenges to 3201 Realty's development project that Village Supermarkets, Inc. ("Village") brought on behalf of itself and Hanover and Horsehill Development LLC fall within the antitrust immunity afforded to petitioning activity under the Noerr-Pennington doctrine.[1] In light of this conclusion and Judge Ambro's conclusion that 3201 Realty does not have antitrust standing, two of the three members of this panel believe that the District Court correctly dismissed the complaint.

In coming to my conclusion that the District Court correctly dismissed the complaint I recognize that a majority of

---

[1] I refer to Village and Hanover and Horsehill Development LLC together as defendants.

the panel, Judge Fuentes and I, believe that the District Court in part erred in concluding that 3201 Realty lacks antitrust standing. But that error does not require us to reverse the Court's judgment because an appellate court may affirm an order granting a motion to dismiss on "any ground supported by the record." Hildebrand v. Allegheny Cnty., 757 F.3d 99, 104 (3d Cir. 2014) (quoting Tourscher v. McCullough, 184 F.3d 236, 240 (3d Cir. 1999)), cert. denied, 135 S.Ct. 1398 (2015). Here, the opinions of the members of the panel demonstrate that a majority of the panel believe that there is such support in the record because I accept defendants' contention that the Noerr-Pennington doctrine immunizes them from antitrust liability for their allegedly anticompetitive judicial and administrative challenges to 3201 Realty's development project, and Judge Ambro accepts defendants' contention that 3201 Realty did not have antitrust standing.[2] Thus, I reiterate that Judge Ambro and I believe that the District Court reached the correct result, though in part on a basis that differs from that on which the Court relied. Accordingly, though the panel is reversing, it should be affirming.

I. THE NOERR-PENNINGTON DOCTRINE IMMUNIZES

---

[2] Defendants raised this argument both in the District Court and in their answering brief on appeal. 3201 Realty failed to address the merits of the argument in its reply brief, but we afforded it an opportunity to do so in a supplemental reply brief and it did so.

DEFENDANTS' CONDUCT FROM ANTRITRUST LIABILITY.

A.      Relevant Law

The Noerr-Pennington doctrine draws its name from the Supreme Court's opinions in Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523 (1961), and United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585 (1965). It derives in part from the First Amendment right to petition the government. Octane Fitness, LLC v. ICON Health & Fitness, Inc., 134 S.Ct. 1749, 1757 (2014); BE & K Constr. Co. v. NLRB., 536 U.S. 516, 524-25, 122 S.Ct. 2390, 2395-96 (2002). Under the doctrine, petitioners for "government . . . redress are generally immune from antitrust liability" when defending against antitrust claims predicated on this petitioning activity. Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 56, 113 S.Ct. 1920, 1926 (1993) ("PRE"); see A.D. Bedell Wholesale Co. v. Philip Morris Inc., 263 F.3d 239, 250 (3d Cir. 2001). The doctrine applies not only to lobbying activity but also "to efforts to influence administrative agency action and efforts to access the court system." Santana Prods. Inc. v. Bobrick Washroom Equip., Inc., 401 F.3d 123, 131 n.13 (3d Cir. 2005) (citation omitted); see Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510, 92 S.Ct. 609, 611-12 (1972); Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119, 122 (3d Cir. 1999). Indeed, "[c]alling concerns about a proposed development to the attention of the responsible state agencies [and courts] lies at the core of privileged activity." Herr v. Pequea Twp., 274 F.3d 109, 121 (3d Cir. 2001).

3

3201 Realty argues that the Noerr-Pennington doctrine does not immunize defendants for their conduct because the allegedly anticompetitive legal challenges to the development project fall within the so-called "sham" exception to the doctrine. In PRE, the Supreme Court established a two-prong test for determining the applicability of this exception including both objective and subjective components. See 508 U.S. at 60-61, 113 S.Ct. at 1928. Under the objective prong, the plaintiff must show that the defendant's petitioning was "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." BE & K Constr., 536 U.S. at 526, 122 S.Ct. at 2396 (quoting PRE, 508 U.S. at 60, 113 S.Ct. at 1928). A plaintiff cannot make this showing if the defendant's petitioning activity has succeeded as "a successful 'effort to influence governmental action . . . certainly cannot be characterized as a sham.'" PRE, 508 U.S. at 58, 113 S.Ct. at 1927 (alteration in original) (quoting Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 502, 108 S.Ct. 1931, 1938 (1988)).

On the other hand, even if a defendant's petitioning activity was unsuccessful, that failure does not prove that it did not have an objective basis for the activity. See id. at 60 n.5, 113 S.Ct. at 1928 n.5; Herr, 274 F.3d at 119. Moreover, "even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit." PRE, 508 U.S. at 60 n.5, 113 S.Ct. at 1928 n.5 (quoting Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 422, 98 S.Ct. 694, 701 (1978)). The second, subjective prong for establishing the sham exception to Noerr-Pennington immunity, comes into play only if the plaintiff first makes a

4

showing satisfying the exception's objective prong.  See PRE, 508 U.S. at 60, 113 S.Ct. at 1928; Cheminor, 168 F.3d at 123 n.10.  Accordingly, a defendant's anticompetitive intent in engaging in petitioning activity is immaterial if it had probable cause for its activity.  See PRE, 508 U.S. at 62, 113 S.Ct. at 1929.

In an effort to avoid the need to satisfy PRE's threshold objective prong, 3201 Realty contends that the PRE test applies only where the defendants institute a single legal action and not where, as here, the defendants brought multiple legal challenges to the plaintiff's enterprise.  3201 Realty supports this position by pointing to cases from other courts of appeals holding that "where the defendant is accused of bringing a whole series of legal proceedings," "the question is not whether any one of them has merit -- some may turn out to, just as a matter of chance -- but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival."  USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO, 31 F.3d 800, 811 (9th Cir. 1994); accord Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27, 728 F.3d 354, 363-64 (4th Cir. 2013); Primetime 24 Joint Venture v. Nat'l Broad., Co., 219 F.3d 92, 101 (2d Cir. 2000).

Judge Ambro and Judge Fuentes accept 3201 Realty's argument circumventing the need to satisfy the objective prong of the dual-prong PRE test.  I believe, however, that the argument should fail for at least three independent reasons. First, 3201 Realty did not raise this argument until it filed its supplemental reply brief in this Court.  Beyond a mere "failure to cite particular cases within its broader argument for the sham

5

exception," majority typescript at 30 n.12, 3201 Realty conceded before the District Court that it had to satisfy PRE's two-prong test and first show that any allegedly anticompetitive "lawsuit or other petitioning activity [was] objectively baseless," Pl.'s Br. in Opp'n to Mot. to Dismiss at 9 (citing PRE, 508 U.S. at 60, 113 S.Ct. at 1928). I therefore would hold that 3201 Realty has waived any argument excusing it from having to establish that defendants' actions were objectively baseless. See Erdman v. Nationwide Ins. Co., 582 F.3d 500, 507 n.2 (3d Cir. 2009) (holding that plaintiff waived argument by conceding the point at issue on the appeal in the district court and explaining that her discovery of the argument upon "'further reading' while preparing [her] appeal" did not justify overlooking the waiver); Bryant v. Military Dep't of Miss., 597 F.3d 678, 694 (5th Cir. 2010) (holding that by not raising it before the district court, plaintiff waived the argument that "the 'objectively baseless' standard ought to be applied in some different, and presumably favorable way in this case because multiple lawsuits were filed against him").

Second, even putting aside the waiver problem, the very case law applying the alternative test for which 3201 Realty advocates, i.e., not applying the PRE two-prong test which includes an objective component in situations in which a defendant has instituted a series of legal actions, demonstrates that the single lawsuit and three administrative challenges that defendants initiated do not rise to the level of "a whole series of legal proceedings" so as to trigger the applicability of the alternative test. See In re Flonase Antitrust Litig., 795 F. Supp. 2d 300, 309 n.10 (E.D. Pa. 2011) ("No court has applied the USS-POSCO test to a 'series' of five petitions . . . ."); see also

6

ERBE Elektromedizin GmbH v. Canady Tech. LLC, 629 F.3d 1278, 1291-92 (Fed. Cir. 2010) (even assuming alternative test applied, no "series" based on defendant filing three lawsuits); Amarel v. Connell, 102 F.3d 1494, 1519 (9th Cir. 1996) (no "series" where defendants initiated two lawsuits and administrative proceedings); Ludwig v. Superior Court, 43 Cal. Rptr. 2d 350, 365 n.33 (Ct. App. 1995) ("[A] total of four activities, two of which are not meritless as a matter of law, cannot constitute such a pattern [of baseless opposition].").
Thus, while Judge Ambro and Judge Fuentes adopt the test of other courts of appeals limiting this application of PRE, it seems to me that they do not correctly apply the case law based on that test, declaring instead that in the present circumstances, though not in others, four actions qualify as a "series."[3] Majority typescript at 33-34. In reality, the four legal challenges that defendants initiated pale in comparison to the 29 in USS-POSCO, 31 F.3d at 811; the 14 in Waugh Chapel, 728 F.3d at 365; and the thousands in Primetime 24, 219 F.3d at 101.

Third, even overlooking both 3201 Realty's waiver of a challenge to the applicability of the two-prong PRE test and the consideration that the courts that have adopted the alternative intent-based test would not apply it in the circumstances we face, I harbor doubts about whether the courts limiting the applicability of PRE have identified a proper exception to that case's two-part test. This purported exception rests on a case on which Judge Ambro and Judge Fuentes heavily rely decided

---

[3] As I explain below there now is an additional case that Village has initiated to consider. See infra note 5. But the addition of this case does not change my conclusion.

7

prior to PRE in which the Supreme Court explained: "One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused." Cal. Motor Transp., 404 U.S. at 513, 92 S.Ct. at 613. Yet it seems to me that the Court's reference to "a pattern of baseless, repetitive claims" makes clear that this language comes into play only where a plaintiff first can satisfy what ultimately became PRE's first prong; otherwise, the Court's use of the word "baseless" would serve no purpose. But the use of "baseless" did serve a purpose because the Court in PRE pointed to this very language as demonstrating that "[n]othing in California Motor Transport retreated" from "an indispensable objective component" in establishing the sham exception. 508 U.S. at 58, 113 S.Ct. at 1927.

In a ruling employing the understanding of PRE that I think is appropriate, we applied the objective prong to uphold a claim of Noerr-Pennington immunity in a case similar to this one where the defendants challenged a plaintiff's land development project in multiple judicial and administrative proceedings. See Herr, 274 F.3d at 115-16, 118-19. Other courts also have rejected the proposed exception to the PRE test advanced here that would dispense with the need to show that the defendant's activity lacked an objectively reasonable basis. See Travelers Express Co. v. Am. Express Integrated Payment Sys. Inc., 80 F. Supp. 2d 1033, 1042 (D. Minn. 1999) (applying PRE rather than Court of Appeals for the Ninth Circuit's test even though defendant filed "a series of allegedly meritless suits"); Christian Mem'l Cultural Ctr., Inc. v. Mich. Funeral

8

Dirs. Ass'n, 998 F. Supp. 772, 777 n.2 (E.D. Mich. 1998) ("[T]he courts in this circuit that have confronted similar issues [of whether an exception to PRE exists where the defendant initiated multiple lawsuits] have declined to read [PRE] so narrowly." (citation omitted)).

I appreciate the animating concern of other courts of appeals that an antitrust defendant's fortuitous success in a small number of lawsuits should not automatically immunize the defendant from the antitrust consequences of initiating a whole series of anticompetitive legal challenges. See Waugh Chapel, 728 F.3d at 365; Primetime 24, 219 F.3d at 101; USS-POSCO, 31 F.3d at 811. But we should not alleviate this concern by excusing a plaintiff from having to show the objective baselessness of even a single action brought by the defendant. After all, if Noerr-Pennington immunity shields objectively reasonable actions when considered individually, it should continue to shield them when they are aggregated. Cf. Pennington, 381 U.S. at 670, 85 S.Ct. at 1593 (holding that immunity extends to petitioning conduct "either standing alone or as part of a broader scheme").

Judge Ambro and Judge Fuentes reason that the alternative test makes more sense when dealing with multiple legal challenges because having a larger sample of challenges than a single challenge enables the court to better "assess whether a defendant has misused the governmental process to curtail competition." Majority typescript at 32. Yet this approach treats PRE's objective prong as more akin to an evidentiary rule of thumb for determining whether the defendant possessed an anticompetitive purpose, rather than the independent and threshold requirement that it unmistakably

9

represents. See 508 U.S. at 57, 113 S.Ct. at 1926 ("[A]n objectively reasonable effort to litigate cannot be sham regardless of subjective intent."); id. at 59-60; 113 S.Ct. at 1928 ("We [earlier] dispelled the notion that an antitrust plaintiff could prove a sham merely by showing that its competitor's 'purposes were to delay [the plaintiff's] entry into the market and even to deny it a meaningful access to the appropriate . . . administrative and legislative fora.'" (second and third alterations in original) (quoting Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365, 381, 111 S.Ct. 1344, 1354 (1991)). Perhaps for this reason, some courts applying an approach similar to that of Judge Ambro and Judge Fuentes have preserved the need for showing the objective baselessness of the defendant's action as a prerequisite for establishing the sham exception. See, e.g., In re Terazosin Hydrochloride Antitrust Litig., 335 F. Supp. 2d 1336, 1367 (S.D. Fla. 2004) (rejecting claim of sham litigation because "none of the lawsuits, individually, can be considered objectively baseless"); Gen-Probe, Inc. v. Amoco Corp., 926 F. Supp. 948, 959 (S.D. Cal. 1996) ("[U]nder either the PRE or the USS-POSCO test, [the plaintiff's] claims against [the defendants] must demonstrate objective baselessness.").

When I consider these questions regarding the legal support for abandoning a threshold objective baselessness requirement, I cannot acquiesce in the adoption of a test where the argument supporting the adoption has not been advanced properly and the test is being applied in circumstances beyond those recognized by other courts that have adopted the test abandoning the objective component of PRE. I therefore would hold that 3201 Realty cannot circumvent a Noerr-Pennington

10

immunity defense without first showing that defendants' legal challenges were objectively baseless.[4]

***

[4] I agree with Judge Ambro and Judge Fuentes that the circumstance that some of defendants' legal actions are ongoing does not preclude application of the sham exception, although I do so based on Supreme Court precedent and not based on the "prospective" character of the alternative test. Majority typescript at 37 n.14. In Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 97 S.Ct. 2881 (1977), the Court faced the question of whether a district court could enjoin an ongoing state court proceeding that allegedly violated federal antitrust law. The Court fractured into three opinions, none of which obtained a majority. See id. at 626, 97 S.Ct. at 2885 (plurality opinion of Rehnquist, J.); id. at 643, 97 S.Ct. at 2893 (Blackmun, J., concurring in result); id. at 645, 97 S.Ct. at 2894 (Stevens, J., dissenting). Nevertheless, although a majority of the Court concluded that the Anti-Injunction Act barred the district court from enjoining the state court proceeding at issue, all nine justices either explicitly or implicitly acknowledged that plaintiffs can seek some form of relief, such as damages or injunctions against future legal actions, based on ongoing sham proceedings brought in violation of the antitrust laws. See id. at 635 n.6, 637 n.8, 97 S.Ct. at 2889 n.6, 2890 n.8 (plurality opinion of Rehnquist, J.); id. at 644, 97 S.Ct. at 2894 (Blackmun, J., concurring in result); id. at 653-54, 97 S.Ct. at 2899 (Stevens, J., dissenting). Indeed, six of the justices declared that, in appropriate circumstances, such antitrust relief could include an injunction against the ongoing sham proceedings themselves. See id. at 644, 97 S.Ct. at 2894 (Blackmun, J., concurring in result); id. at 654, 660, 97 S.Ct. at

11

B.    Application of <u>PRE</u> to Present Case

I now turn to the question of whether 3201 Realty can show that defendants' activities were objectively baseless. I initially point out that 3201 Realty arguably has waived this issue, which is distinct from the question of whether to apply the alternative test that does not require objective baselessness, by not adequately arguing it on appeal.    3201 Realty's supplemental reply brief starts from the premise that the alternative test to <u>PRE</u> applies but does not assert that defendants' legal challenges lacked an objectively reasonable basis, and only briefly suggests that defendants did not have standing to bring these challenges or that the challenges otherwise lacked merit.  <u>See, e.g.</u>, <u>John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.</u>, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997)

2899, 2902 (Stevens, J., dissenting).  Subsequently, in a case arising under federal labor law, the Court drew on the sham exception to <u>Noerr</u>-<u>Pennington</u> to hold that an ongoing baseless lawsuit may be enjoined if it was brought for an improper purpose.  <u>See</u> <u>Bill Johnson's Rests., Inc. v. NLRB</u>, 461 U.S. 731, 744, 103 S.Ct. 2161, 2170 (1983).

These Supreme Court cases illustrate that a plaintiff can bring an antitrust claim circumventing <u>Noerr</u>-<u>Pennington</u> immunity by relying on the sham exception even if the allegedly sham legal actions remain pending.  This conclusion is logical given that a determination of whether anticompetitive legal actions fall within the sham exception turns not on their ultimate outcomes but on the existence of a reasonable basis (or a proper motive) for instituting and pursuing them in the first place.  <u>See</u> <u>PRE</u>, 508 U.S. at 60 n.5, 113 S.Ct. at 1928 n.5.

12

("[A]rguments raised in passing . . . , but not squarely argued, are considered waived."). Nevertheless, I will give 3201 Realty the benefit of the doubt and consider the arguments that defendants' actions were objectively baselessness to which it alluded in its supplemental reply brief. 3201 Realty simply cannot meet the objective baselessness standard that PRE recognized.

Where the complaint fails at least to raise a question of fact on a sham petitioning issue, a court may reject the claim by granting a motion to dismiss. See PRE, 508 U.S. at 63, 113 S.Ct. at 1930 ("Where, as here, there is no dispute over the predicate facts of the underlying legal proceeding, a court may decide probable cause as a matter of law."); A.D. Bedell, 263 F.3d at 241 (affirming dismissal under Fed. R. Civ. P. 12(b)(6) of antitrust claims based on Noerr-Pennington doctrine).

In arguing that defendants' legal challenges were objectively baseless, 3201 Realty primarily contends that they lacked standing when they made these challenges. For support, 3201 Realty points to the decisions of the New Jersey Superior Court and the New Jersey Department of Environmental Protection ("NJDEP") respectively concluding that Village lacked standing in its prerogative writs action and flood hazard area ("FHA") permit challenges. But as I already have noted, the ultimate failure of an underlying action does not establish its objective baselessness. See PRE, 508 U.S. at 60 n.5, 113 S.Ct. at 1928 n.5 ("[W]hen the antitrust defendant has lost the underlying litigation, a court must 'resist the understandable temptation to engage in post hoc reasoning by concluding' that an ultimately unsuccessful 'action must have been unreasonable or without foundation.'" (quoting Christiansburg, 434 U.S. at

13

421-22, 98 S.Ct. at 700)); Herr, 274 F.3d at 119 (rejecting plaintiff's claim of sham litigation where opinions in underlying actions demonstrated that courts analyzed relevant issues "with care and some detail" and did not consider them "frivolous"); Balt. Scrap Corp. v. David J. Joseph Co., 237 F.3d 394, 400 (4th Cir. 2001) (rejecting antitrust plaintiff's claim of sham litigation notwithstanding that state court had dismissed underlying suit for lack of standing).

3201 Realty has not shown that a reasonable litigant in Village's position would have perceived that it did not have a realistic possibility of establishing standing in the relevant actions. To the contrary, the New Jersey Superior Court's decision in the prerogative writs action demonstrates that a reasonable litigant could have perceived such a possibility in that case. In particular, Village cited several cases before that court in support of its claim that it had standing based on its status as a local taxpayer. For example, the court had stated in one of those cases that "[t]here is some support for the proposition that any local taxpayer has standing to object to a variance application, although the question has not clearly been resolved." Vill. Supermarket, Inc. v. Mayfair Supermarkets, Inc., 634 A.2d 1381, 1385 (N.J. Super. Ct. Law Div. 1993) (citing Booth v. Bd. of Adjustment of Rockaway Twp., 234 A.2d 681, 682 (N.J. 1967)). The Superior Court ultimately decided this issue against Village, but "[i]n light of the unsettled condition of the law," Village had a reasonable basis for its position. PRE, 508 U.S. at 65, 113 S.Ct. at 1930.

Similarly, in the FHA permit challenge, Village argued that its expected loss of business as a direct competitor of the proposed supermarket qualified as a sufficiently particularized

14

property interest to establish standing. But I need look no further than the discussion of antitrust standing in Judge Fuentes's opinion to see that status as a direct competitor sometimes can demonstrate a unique property interest in filing a legal challenge. See, e.g., majority typescript at 26 ("Antitrust injury ordinarily is limited to consumers and competitors in the restrained market."). Although the NJDEP ultimately decided to treat Village's business interests as equivalent to other generalized interests that do not support standing, the cases on which it relied did not involve challenges brought by competitors and therefore did not foreclose Village's argument. Village therefore had a reasonable basis for its position in this action as well. See id., 113 S.Ct. at 1931 ("Even in the absence of supporting authority, [the antitrust defendant] would have been entitled to press a novel . . . claim as long as a similarly situated reasonable litigant could have perceived some likelihood of success.").

Furthermore, 3201 Realty has not demonstrated that Village's argument for standing in its wetlands permit challenge was any weaker than the foregoing arguments for standing. Finally, as to the major street intersection ("MSI") permit challenge, the New Jersey Department of Transportation ("NJDOT") affirmatively acknowledged Village's standing to raise its objections, noting that the department was "required to consider any relevant data, analysis, and arguments submitted by third parties in reaching its decisions concerning the approval of access permits." J.A. 165. I therefore reject 3201 Realty's argument that defendants' legal challenges should be regarded as objectively baseless because defendants lacked standing to make the challenges. See Balt. Scrap Corp., 237 F.3d at 400;

15

Liberty Lake Invs., Inc. v. Magnuson, 12 F.3d 155, 157 (9th Cir. 1993).

Nor has 3201 Realty demonstrated that defendants' challenges were objectively baseless on their merits. Indeed, the relevant adjudicators upheld some of Village's objections in two of these challenges. In the MSI permit challenge, the NJDOT agreed with Village that a prior development agreement required 3201 Realty either to construct certain highway improvements or negotiate a new agreement before it could proceed with its project. Likewise, in the wetlands permit challenge, the NJDEP first "required" 3201 Realty to re-notice its application due to a defect that Village identified in the original application. J.A. 169. Then, based on another objection raised by Village, the NJDEP required 3201 Realty to conduct a wildlife survey for the presence of an endangered species of bats before beginning work on the property. Although Village did not prevail in its other two challenges, the Superior Court's and the NJDEP's opinions in those proceedings each addressed Village's contentions "with care and some detail" and without indicating that those reviewing bodies considered Village's positions "frivolous." See Herr, 274 F.3d at 119.

In these circumstances, 3201 Realty has not shown that defendants' petitioning activity was objectively baseless. Defendants' conduct therefore falls within the immunity afforded by the Noerr-Pennington doctrine, and 3201 Realty's antitrust claims must fail. Therefore, we should affirm the District Court's order dismissing the complaint. Inasmuch as I have reached this conclusion, I do not address the other arguments that defendants raise in support of the District Court's

16

order dismissing the complaint.[5]

II. JUDGE AMBRO'S AND MY AGREEMENT THAT THE DISTRICT COURT ENTERED THE CORRECT JUDGMENT MANDATES AN AFFIRMANCE.

As I stated at the outset of this opinion, Judge Ambro and I agree that the District Court correctly dismissed the complaint. Judge Ambro reaches this conclusion because he believes that 3201 Realty did not have the antitrust standing necessary to bring this action, and I do so because I believe that defendants were immune under the Noerr-Pennington doctrine. A reasonable observer might think it is obvious that the inescapable consequence of this agreement is that we must affirm the District Court's judgment dismissing the complaint. But Judge Ambro avoids this outcome by regarding himself as "bound by the majority's [Judge Fuentes's and Judge Greenberg's] opinion on antitrust standing despite [his] disagreement with it," Ambro typescript at 11, an application of the principle of stare decisis. He therefore effectively switches

---

[5] On September 10, 2015, 3201 Realty's attorneys filed a letter with attachments pursuant to Fed. R. App. P. 28(j) indicating that Village's chief operating officer on August 12, 2015, filed a complaint in the Superior Court of New Jersey seeking an injunction stopping the clearing work on 3201 Realty's property on the ground that 3201 Realty obtained its wetland permit by fraud. To the best of my knowledge this case has not been resolved so I do not take it into account as I do not know if the suit is objectively baseless.

17

what should be his vote from an affirmance of the Court's order to a reversal. As a result a majority of the panel consisting of Judge Fuentes and Judge Ambro announce the Court's judgment based on the following shifting majorities as to individual issues: (1) Judge Fuentes's and my view that 3201 Realty has antitrust standing and (2) Judge Fuentes's and Judge Ambro's view that 3201 Realty's complaint overcomes a Noerr-Pennington defense. I regard it as ironical that even though I believe we should affirm the judgment of the District Court, my view on an issue on which I would not decide the case is a factor leading to its reversal. Indeed, if I only stated my views on the Noerr-Pennington issue, then for certain we would be affirming because Judge Ambro surely would not have seen himself as bound by Judge Fuentes's views if they stood alone. But I took a position on standing because courts usually if not always decide whether a plaintiff has standing before they consider the merits of a case.

Although it is not my place to tell Judge Ambro how and on what issues to vote, I write here to express my view that a multimember panel should reach the result that follows from the independent views of its members. Judge Ambro's willingness to be bound by the Fuentes-Greenberg majority's position on antitrust standing trumps his own conclusion on the standing issue and runs counter to the longstanding and widespread practice of the federal courts of appeals of counting judges' views as to outcome and not as to individual issues. Although some scholars have criticized this prevailing practice, critics and proponents alike acknowledge its acceptance among the courts. See David S. Cohen, The Precedent-Based Voting Paradox, 90 B.U. L. Rev. 183, 222 (2010) ("[T]he [Supreme] Court currently

uses outcome voting to reach a result, as it votes on the outcome and then the Justices write their opinions to support the outcome."); Lewis A. Kornhauser & Lawrence G. Sager, The One and the Many: Adjudication in Collegial Courts, 81 Cal. L. Rev. 1, 31 (1993) ("[T]he case-by-case protocol has been the encompassing norm of the Court throughout its existence."); Jonathan Remy Nash, A Context-Sensitive Voting Protocol Paradigm for Multimember Courts, 56 Stan. L. Rev. 75, 86 (2003) ("[T]he standard voting protocol is generally to determine the ultimate outcome in a case . . . based upon each judge's views as to the outcome in the case."); David Post & Steven C. Salop, Rowing Against the Tidewater: A Theory of Voting by Multijudge Panels, 80 Geo. L.J. 743, 750 (1992) ("It is clear that courts most frequently utilize outcome-voting."); John M. Rogers, "Issue Voting" by Multimember Appellate Courts: A Response to Some Radical Proposals, 49 Vand. L. Rev. 997, 998 (1996) ("[T]he overwhelming practice of the justices on the Court has been to vote for the consequence of the individual justice's own reasoning."); Maxwell L. Stearns, Standing and Social Choice: Historical Evidence, 144 U. Pa. L. Rev. 309, 313-14 (1995) ("Within particular cases, the Court -- along with virtually all appellate courts -- employs case-by-case, rather than issue-by-issue, decisionmaking.").

This practice of outcome voting comports with the general primacy that our law affords to judgments over opinions. See Jennings v. Stephens, 135 S.Ct. 793, 799 (2015); Edward A. Hartnett, A Matter of Judgment, Not a Matter of Opinion, 74 N.Y.U. L. Rev. 123, 127-34 (1999). It is well established that we review a district court's judgment, not its opinion. See Jennings, 135 S.Ct. at 799; Blunt v. Lower Merion

Sch. Dist., 767 F.3d 247, 303 n.73 (3d Cir. 2014), cert. denied, 135 S.Ct. 1738 (2015). Just as this principle requires us to affirm a district court's judgment even if that court's reasoning differs from our own, it also should lead us to affirm even if our respective grounds for doing so diverge. See Blunt, 767 F.3d at 303 n.73 (affirming district court's order even though only Judge Greenberg agreed with that court's rationale because Judge Ambro reached same disposition on other grounds).

In view of the primacy of judgments over opinions, we may enter judgments without even issuing opinions. See, e.g., Quaciari v. Allstate Ins. Co., 172 F.3d 860 (3d Cir. 1998); Hoover v. Watson, 74 F.3d 1226 (3d Cir. 1995); see also Fed. R. App. P. 36. In fact, until some years ago this Court regularly disposed of appeals by issuing judgment orders without accompanying opinions, sometimes even in complex cases. Indeed, our internal operating procedures still authorize the use of judgment orders to announce the outcome of a case though the practice of using judgment orders has fallen into disuse. 3d Cir. I.O.P. 6.1. And in cases that do result in the issuance of opinions, both the Supreme Court and this Court issue the judgment supported by the independent views of a majority of the judges even if a majority does not coalesce around a single rationale. See, e.g., Kerry v. Din, 135 S.Ct. 2128, 2131 (2015) (plurality opinion); United States v. Dupree, 617 F.3d 724, 726 (3d Cir. 2010); Cruz v. Chesapeake Shipping, Inc., 932 F.2d 218, 220 (3d Cir. 1991) (Rosenn, J., announcing the judgment of the court); cf. Michael v. Horn, 459 F.3d 411, 429 n.18 (3d Cir. 2006) (Greenberg, J., concurring) ("[I]t is always true that even though judges agree on the appropriate outcome of a case, they would not write identical opinions."). "That the court is able to

20

issue any judgment at all in such cases clearly demonstrates that outcome-voting has been utilized." Post & Salop, Rowing Against the Tidewater, supra, at 750. Accordingly, "the outcome of a case in a multimember court depends on the tally of votes concerning the judgment even if the tally of votes concerning each issue resolved by opinion would logically produce a different conclusion." Hartnett, supra, at 134.

Judge Ambro declines to follow this accepted practice of independent outcome voting because of the "voting paradox" that arises if issue-by-issue resolution of a case would lead to a conclusion that is opposite to that reached based on outcome voting. But in the absence of the voting paradox it would not matter if a court decided a case on an issue-by-issue or outcome basis. Moreover, the Supreme Court repeatedly and consistently has utilized outcome voting even in cases implicating the voting paradox. See, e.g., Miller v. Albright, 523 U.S. 420, 118 S.Ct. 1428 (1998); Am. Trucking Ass'ns, Inc. v. Smith, 496 U.S. 167, 110 S.Ct. 2323 (1990); Nat'l Mut. Ins. Co. of D.C. v. Tidewater Transfer Co., 337 U.S. 582, 69 S.Ct. 1173 (1949); see also Cohen, supra, at 183-84 (noting existence of more than 30 such cases in Supreme Court history). Moreover, as Judge (then Professor) Rogers has pointed out "[O]ver 150 Supreme Court cases involving plurality majority opinions indicate that a justice should not [aggregate votes by issue and therefore] defer to a majority that disagrees on a dispositive issue." John M. Rogers, "I Vote This Way Because I'm Wrong": The Supreme Court Justice as Epimenides, 79 Ky. L.J. 439, 459 (1990-91).

So far as I can ascertain the only support in Supreme Court cases for Judge Ambro's vote which leads to a result on a controlling issue in the case different from that which should

21

follow from his view of the case comes from three cases in which justices deferred to a majority on an issue that they would have resolved differently and therefore provided the decisive vote or votes in favor of a judgment that contradicted their own reasoning. See Arizona v. Fulminante, 499 U.S. 279, 313-14, 111 S.Ct. 1246, 1267 (1991) (Kennedy, J., concurring in the judgment); Pennsylvania v. Union Gas Co., 491 U.S. 1, 56-57, 109 S.Ct. 2273, 2295-96 (1989) (White, J., concurring in the judgment in part and dissenting in part); United States v. Vuitch, 402 U.S. 62, 96, 91 S.Ct. 1294, 1311 (1971) (Harlan, J., dissenting); id. at 97-98, 91 S.Ct. at 1312 (separate opinion of Blackmun, J.). Significantly, each of the other justices in these cases maintained the normal practice of voting for the judgment supported by the justice's own reasoning. See Hartnett, supra, at 137; Kornhauser & Sager, supra, at 18-19, 24. Moreover, the justices who gave the "structurally aberrant" votes did not offer any explanation for their divergence from accepted practice. Kornhauser & Sager, supra, at 2; see Nash, supra, at 84 (noting that judges who have employed issue-based voting have "simply do[ne] so by fiat"); Rogers, "Issue Voting", supra, at 998 ("There was no tenable justification given for the anomalous votes in each case . . . ."). These few deviations, "supported by simple ipse dixit, are pretty meager authority compared to the overwhelming precedent against" the majority's approach. Rogers, "I Vote This Way Because I'm Wrong", supra, at 463.

Judge Ambro explains his use of issue voting and his consequent vote that results in an outcome that as an individual judge he rejects as a consequence of Judge Fuentes's and my view on "the scope of the law of antitrust standing [which is] now the law of this Circuit . . . I am obliged to consider the

22

merits of [3201 Realty's] suit." Id. at 1. Thus, to Judge Ambro the principal of stare decisis applied on an internal basis within a case controls the outcome of this appeal even though he does not use the term stare decisis in explaining his view of how to decide the case. I believe, however, that this reasoning is incorrect. To start, at the time that Judge Ambro wrote these words, and even now, the panel had not yet filed an opinion in this case, so Judge Fuentes's opinion cannot be the law of this Circuit. This point cannot be dismissed as a mere timing technicality because the draft opinion must be circulated to all the active judges of the Court who then have an opportunity to vote for initial en banc consideration of the case before the opinion is filed. 3d Cir. I.O.P. 5.5.

Nor does Judge Ambro's decision to defer in this case to a majority's view on the standing issue present an apt analogy to the application of the principle of stare decisis. Deferring to a majority resolution of an issue within the same case does not serve the policies underlying stare decisis, including the protection of individuals' reliance on earlier cases, the need to maintain consistency with earlier cases, the judicial efficiency of not revisiting issues that already have been decided, and the idea that the collective wisdom of courts over the years should supersede the limited insights of a court hearing a single case. See Rogers, "I Vote This Way Because I'm Wrong", supra, at 463-65. Furthermore, if a judge had an obligation to follow a panel majority's conclusion there never should be a dissent.

Yet as discussed, rather than following a rule of deference to a majority within the same case, judges nearly invariably vote for the result supported by their individual reasoning, whether the case involves a voting paradox or not. It

23

is obvious that each instance in which a judge dissents reflects an example of a judge declining to defer to a majority view. Accordingly, Judge Ambro's use of the principle of stare decisis to support his vote runs "contrary to the overwhelming weight of precedent." Rogers, "I Vote This Way Because I'm Wrong", supra, at 440. Such rare and selective deference constitutes little deference at all, let alone a proper analogue to the rule of stare decisis, which serves very different purposes.

I recognize that in voting-paradox cases, outcome voting does produce an apparently odd result when compared with the outcome that results when a case is decided on the basis of the judges' individual reasoning regarding each underlying issue. But, contrary to Judge Ambro's suggestion, outcome voting does not render the precedential value of such cases "unclear." Ambro typescript at 22.

Outcoming voting in this case would yield the following straightforward body of law for district courts in this Circuit to apply: (1) if a case arises that only implicates the standing issue, then, if the facts of that case cannot be distinguished from those here, the court should hold that the plaintiff has antitrust standing based on Judge Fuentes's and my resolution of that issue; (2) if a case arises that implicates the Noerr-Pennington issue in a situation that factually cannot be distinguished from that in this case, the court should hold that the defendant lacks such immunity based on Judge Fuentes's and Judge Ambro's resolution of that issue; but (3) if a case arises presenting both issues, then, again, if the facts of that case cannot be distinguished from the facts here, the court should dismiss the case. See, e.g., Greene v. Teffeteller, 90 F. Supp. 387, 388 (E.D. Tenn. 1950) (applying Supreme Court case that involved

24

voting paradox and emphasizing that "precedent is established by the votes of the justices, not by the reasons given for their votes."). Although no judge would reach all of these three conclusions if acting alone, district courts could apply this tripartite rule both "easily" and "consistently." Rogers, "Issue Voting", supra, at 1013. Hence, outcome voting would produce "clear" guidance to district courts. Id. at 1009.

Moreover, issue voting does not offer a panacea to the problem of voting paradoxes. Rather, issue voting raises its own set of potential difficulties, including indeterminacy in how to identify the relevant issues, the prospect of a judge strategically flipping the judgment by dividing an issue into deeper sub-issues where a majority of the judges agree as to the meta-issue but not as to the sub-issues, the possible inability of the court to issue a judgment due to cycling in how a majority would prefer to resolve the relevant issues, and the thwarting of a majority's view as to the correct judgment. See Cohen, supra, at 223-24; Michael I. Meyerson, The Irrational Supreme Court, 84 Neb. L. Rev. 895, 947-49 (2006); Rogers, "Issue Voting", supra, at 1002-06; Maxwell L. Stearns, How Outcome Voting Promotes Principled Issue Identification: A Reply to Professor John Rogers and Others, 49 Vand. L. Rev. 1045, 1063-65 (1996); Maxwell L. Stearns, The Misguided Renaissance of Social Choice, 103 Yale L.J. 1219, 1267 n.177 (1994). Thus, even proponents of issue voting concede that "there is potential incoherence in an issue voting system" as well. David G. Post & Steven C. Salop, Issues and Outcomes, Guidance, and Indeterminacy: A Reply to Professor John Rogers and Others, 49 Vand. L. Rev. 1069, 1083 (1996).

The difficulties introduced by issue voting even may

25

undermine the clarity and usability of precedents, the very problem that Judge Ambro identifies as a consequence of outcome voting. See Rogers, "Issue Voting", supra, at 1009-11. After all, just seven years after Justice White employed issue voting to change the outcome in Union Gas, the Supreme Court overruled that case partly because of the "confusion" it had created "among the lower courts that ha[d] sought to understand and apply the deeply fractured decision." Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 64, 116 S.Ct. 1114, 1127 (1996). The Court's about-face can be viewed as "a criticism of the practice of vote switching" and may "stand[] for the proposition that holdings produced as a result of a vote switch will have only limited stare decisis value." Maxwell L. Stearns, Should Justices Ever Switch Votes?: Miller v. Albright in Social Choice Perspective, 7 Sup. Ct. Econ. Rev. 87, 155 (1999). Problems therefore attend to either voting protocol. "Rather than rail at the dilemma wrought by the imperfections of our system [of outcome voting], . . . we should recognize that these imperfections are simply part of the inherent limitations of humanity." Meyerson, supra, at 952.

To the extent that judges find the voting paradox dissatisfying, instead of abandoning the longstanding and widespread practice of independent outcome voting, they can avoid the paradox by not considering issues after addressing an issue that would for them resolve the case. See id. at 951; Post & Salop, Issues and Outcomes, supra, at 1072 (noting that the paradox can only occur if "the judges reveal their views on each of the underlying issues presented by the case"). Unlike issue voting, the decision not to reach unnecessary questions, even when that decision involves not deferring to a majority on an

26

issue and results in a judgment not supported by a single majority rationale, has firm roots within our appellate court practice. See, e.g., Cruz, 932 F.2d at 233 (Cowen, J., concurring in the judgment only); Lowry v. Balt. & Ohio R.R. Co., 707 F.2d 721, 723 (3d Cir. 1983) (en banc) (per curiam); see also Rogers, "I Vote This Way Because I'm Wrong", supra, at 449 n.27 (collecting more than two dozen such Supreme Court cases). Indeed, the voting paradox may so seldom appear in appellate court opinions because the judges in the majority as to outcome "typically do not reveal their views on issues that they 'do not need to reach' in order to vote for" that outcome. Post & Salop, Rowing Against the Tidewater, supra, at 748.

Again, it surely is not for me to tell another judge how to vote. Yet I cannot help being aware that there would not be a voting paradox here if Judge Ambro had gone no further after concluding that the District Court's dismissal of the complaint should be affirmed on the ground that 3201 Realty lacks antitrust standing. There is no doubt that if Judge Ambro had followed this approach, we would affirm based on his and my independent reasoning. See Hartnett, supra, at 142-43 ("In [Union Gas and Fulminante], not only did the judgment ultimately entered fail to reflect how a majority of Justices believed the case should have been decided, but worse, unnecessary statements in opinions altered the judgment in the case. . . . That is not a result we should welcome . . . .").

In fact, if Judge Ambro had gone no further after concluding that the District Court's judgment should be affirmed because 3201 Realty lacks antitrust standing, we inescapably would affirm regardless of whether we used outcome or issue voting. If we used outcome voting, then two

27

judges, Judge Ambro and I, would be voting to affirm. If we used issue voting, then the vote on the Noerr-Pennington issue would have been equally divided, with Judge Fuentes rejecting the defense of immunity and with me accepting it. The consequence of that even split is that the District Court's order of dismissal would have been affirmed by an equally divided vote. See Exxon Shipping Co. v. Baker, 554 U.S. 471, 484, 128 S.Ct. 2605, 2616 (2008); In re Mkt. Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992). Though the District Court did not address the Noerr-Pennington issue as it had no need to do so because 3201 Realty did not convince the Court that it had antitrust standing, still defendants advanced the defense in that Court so that the claim of Noerr-Pennington immunity was preserved and thus defendants properly could raise it on this appeal. Accordingly, the usual rule that an equally divided appellate court leads to an affirmance of the trial court's judgment would apply.

Judge Ambro contends that if 3201 Realty had prevailed on the standing issue in the District Court and if the defendants were not barred from appealing by the final judgment rule and had appealed, we would have affirmed on the standing appeal. Then if defendants prevailed on the Noerr-Pennington issue in the District Court and 3201 Realty appealed we would have reversed. Thus, 3201 Realty would win the case even though a majority of the panel thought it should lose. While Judge Ambro may be correct on this point this hypothetical set of facts did not happen.

Furthermore, a different hypothetical supports the use of outcome voting. Suppose this appeal had been decided by a single judge. If I had been that judge, then the District Court's

order would be affirmed. If Judge Ambro had been that judge, once again the District Court's order would be affirmed. Only if Judge Fuentes had been that judge, would the District Court's order have been reversed. I cannot understand why the circumstance that we are all on the panel should lead to a different result than that which would have been reached individually by a majority of the panel.

Issue voting "is in considerable tension with the traditional emphasis, rooted in Article III, on courts as case deciders." Hartnett, supra, at 134 n.58. As has long been true, "[t]he question before [us as] an appellate Court is, was the judgment correct, not the ground on which the judgment professes to proceed." McClung v. Silliman, 19 U.S. (6 Wheat.) 598, 603 (1821). Although almost two centuries have passed since the Supreme Court decided McClung, the law that the Court stated there remains good law and no court has better expressed the principle that it recognized. Inasmuch as two of the three members of the panel agree that the judgment was correct, though for different reasons, surely we are constrained to affirm.[6] Because the Court does not reach this result and because I believe that defendants have a Noerr-Pennington defense, I respectfully dissent from the outcome the Court reaches even though I agree with Judge Fuentes on his resolution of the standing issue.

---

[6] In my view, this case can be resolved by making simple mathematical calculations that do not require that we use a super computer: (1) one and one make two, and (2) two out of three is a majority.